# EXHIBIT "A"

```
 1

 2                    UNITED STATES DISTRICT COURT

 3                   NORTHERN DISTRICT OF CALIFORNIA

 4

 5    BRUCE KYLES,                    )
                                      )
 6          Plaintiff,               )   Case No. C-13-3695-WHO
                                      )
 7                                    )
          vs.                         )   Volume I
 8                                    )
                                      )
 9    CITY OF PITTSBURG, et al.,      )   Pages 1 - 84
                                      )
10                                    )
          Defendants.                )
11                                    )
      _____)
12

13                         Deposition of

14                         JUAN SIMENTAL

15                        September 3, 2014

16          (PAGES 81 - 83 WERE MARKED AS CONFIDENTIAL

17       SUBJECT OF A PROTECTIVE ORDER AND BOUND SEPARATELY)

18

19    Reported by:

20    Colleen Alvarado CSR # 11987

21    ----------------------------------------------------------------

22                    JAN BROWN & ASSOCIATES

23          WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24    701 Battery Street, 3rd Floor, San Francisco, CA 94111

25                (415) 981-3498 or (800) 522-7096
```

1

JUAN SIMENTAL - September 3, 2014

1                          I N D E X

2                                                        PAGE

3        Examination by Mr. Robinson                      4

4

         Reporter's Certificate                           84

5

6

7                          I N D E X   O F

8                          E X H I B I T S

9

10                                                       PAGE

11

12           (Pages 81 through 83 were marked as

13           Confidential Subject of a Protective Order.)

14

15

                            ---oOo---

16

17

18

19

20

21

22

23

24

25

                                                             2

JUAN SIMENTAL - September 3, 2014

```
1     A.     I was in the Marine Corp.

2     Q.     Where were you stationed?

3     A.     Camp Pendelton, California and South Korea.

4     Q.     What rank did you obtain?

5     A.     Sergeant.

6     Q.     E-5?

7     A.     Yes, sir.

8     Q.     Why did you leave the military?

9     A.     To pursue a career in law enforcement.  At

10    that time I didn't leave the military, I still

11    remained in the reserves.

12    Q.     Are you a reservist still?

13    A.     No, sir.

14    Q.     Before November 30, 2011, did you have any

15    interactions at all with Bruce Kyles?

16    A.     Yes, sir, I did.

17    Q.     When was your initial interaction with Bruce

18    Kyles?

19    A.     I arrested him in -- I was working as a police

20    officer in Pittsburg.  I don't remember the date.  I

21    would estimate to say that it was sometime in 2007.

22    Q.     On November 30, 2011, during your initial

23    interaction with Mr. Kyles, did you recognize him?

24    A.     Yes, sir, I did.

25    Q.     And what did you know about him as you were
```

10

1  interacting with him on November 30, 2011?

2  A.    I knew he was violent towards police.

3  Q.    Did you have that in mind when you were

4  interacting with him?

5  A.    Yes.

6  Q.    When you say "violent towards police," what do

7  you mean?

8  A.    He's a fighter.  He likes to fight the

9  police.

10  Q.    When you arrested him, what did you arrest him

11  for in 2007?

12  A.    Possession and resisting arrest and possession

13  of heroine.

14  Q.    In 2007 when you arrested him, who else was

15  present during the arrest?

16  A.    Officer James Terry.

17  Q.    Did Mr. Kyles get violent with you?

18  A.    No.

19  Q.    What did he do to resist arrest at that time?

20  A.    At that time we stopped him for a municipal

21  violation on his bicycle.  He refused to stop and

22  took off on his bicycle.  I tackled him off his

23  bicycle.  He refused to place his hands behind his

24  back.  We had to forcibly place his hands behind his

25  back, and place him under arrest for possessing

11

1    heroine.

2    Q.    Was he charged with a PC 69 violation?

3    **A.    No, sir.**

4    Q.    PC 148?

5    **A.    Yes, sir, from what I can remember without**

6    **looking at the report.**

7    Q.    You know, let's talk about why you came out to

8    the scene on November 30, 2011.

9         What led you to go to 1906 Seaward on that

10   day?

11   **A.    I received -- I was dispatched to take a call**

12   **from a reporting party.  I will butcher her name**

13   **here -- Penashey (phonetic.)  She stated she owned**

14   **the property at 1905 Seaward.**

15   Q.    That's across the street from 1906?

16   **A.    Yes, sir.**

17   Q.    How long did you speak with Ms. Penashey?

18   **A.    Approximately 20 minutes.**

19   Q.    What did she tell you during this

20   conversation?

21   **A.    She told me that she has a friend who lives at**

22   **1905 -- she rents out to a friend at 1905, and that**

23   **her friend is very scared to go out at night.  She**

24   **is -- she constantly see loiterers in front of 1906.**

25   **She suspects drug activity.  And on various occasions**

                                                          12

1    she had seen physical altercations, fights at the

2    location in front of the house.

3    Q.    At the time you spoke to Ms. Penashey on

4    November 30, 2011, did she describe criminal activity

5    in progress at 1906 Seaward?

6    A.    No.

7    Q.    She just reported that history of complaints

8    she had about the property and people engaging in

9    what she believed to be criminal contact on the

10   premises; correct?

11   A.    Yes, sir.

12   Q.    When you arrived at 1906 Seaward on

13   November 30, 2011, what was the first thing you saw

14   that was suspicious?

15   A.    I saw a brown sedan parked in the driveway

16   with no license plates, and two subjects sitting in

17   the vehicle.

18   Q.    Is it illegal to park an unlicensed vehicle on

19   private property?

20   A.    No, sir.

21   Q.    What was suspicious about what you observed

22   initially?

23   A.    What was suspicious to me that at the time of

24   the day -- initially upon arriving, black male exits

25   the driver's seat and becoming very confrontational

                                                          13

1    with me.

2         Q.    Did Mr. Kyles -- strike that.

3               You learned later that was Mr. Kyles; correct?

4         A.    Yes.

5         Q.    Was Mr. Kyles --

6               MR. ALLEN:  Well, objection as to "learned

7         later."  He said that he recognized Kyles upon seeing

8         him.

9               MR. ROBINSON:  Okay.

10        Q.    When did you first realize that was Bruce

11        Kyles in the vehicle?

12        A.    As soon as he exited the vehicle.

13        Q.    Was he combative as soon as he exited?

14        A.    Yes, he was.

15        Q.    And where were you when Mr. Kyles exited the

16        vehicle?

17        A.    We almost exited simultaneously.  I exited my

18        patrol vehicle pretty much at the same time that he

19        exited his car.

20        Q.    And your patrol vehicle, was the driver's side

21        parked curbside, or was it parked street side?

22        A.    Driver's side was parked curbside.

23        Q.    So you had a straight shot to the vehicle

24        where Mr. Kyles was sitting when you first arrived;

25        is that correct?

14

1    A.    Correct.

2    Q.    Was Mr. Kyles engaged in any criminal activity

3    when you first observed the black male in the vehicle

4    at 1906 Seaward?

5    A.    No.

6    Q.    When you first approached the car in which

7    Mr. Kyles was sitting, as he exited, was it your

8    intention to detain him?

9    A.    Not at that point.

10   Q.    Did you have any understanding as you

11   approached the vehicle and recognized Mr. Kyles, that

12   he was on either probation or parole?

13   A.    I believe I knew he was on parole.  I don't

14   recall whether I did or not.

15   Q.    At some point did you make a decision to

16   detain Mr. Kyles?

17   A.    Yes, I did.

18   Q.    When did you make that decision?

19   A.    I made the decision to detain Mr. Kyles when

20   he continued to obstruct my investigation into making

21   contact at the residence, No. 1.  And, No. 2,

22   allowing -- distracting me enough to allow the female

23   he was with to flee the scene.

24   Q.    Let's break that down.

25   A.    Sure.

                                                         15

JUAN SIMENTAL - September 3, 2014

1    Q.    So Mr. Kyles was obstructing your ability to

2    maintain control of the female who fled the scene; is

3    that correct?

4    A.    Yes.

5    Q.    What was he doing to obstruct that ability?

6    A.    He was challenging me to a fight.

7    Q.    Was he challenging you to a fight, or was he

8    challenging you to arrest him?

9    A.    He was challenging me to -- threatened to

10   fight if I detained him or arrested him.

11   Q.    How many times did he challenge you before you

12   made the decision to detain him?

13   A.    I would say approximately five.

14   Q.    When you approached Mr. Kyles, did you have

15   any weapons drawn?

16   A.    No.

17   Q.    At what point in this interaction with

18   Mr. Kyles, did you draw a weapon, if at all?

19   A.    Initially I had my taser out, which is

20   referred to as a weapon.  Is that...

21   Q.    Okay.  Back up a second.

22         What particular weapons did you have on your

23   belt at the time you approached the Kyles -- the

24   vehicle that Kyles was in?

25   A.    I had my baton, my firearm, taser, pepper

16

JUAN SIMENTAL - September 3, 2014

1    spray -- tools, I guess.

2    Q.    Tools, okay.  And when you exited your vehicle

3    and you had both feet on the ground, did you draw a

4    weapon at that time or tool at that time?

5    A.    No, sir.

6    Q.    At what point did you initially remove a tool

7    from your belt?

8    A.    When I saw Mr. Kyles' demeanor towards me.

9    His clenched fists walking towards my direction.  At

10   that point I pulled out my taser.

11   Q.    At what point did you activate your taser

12   camera?

13   A.    As soon as you turn on the taser, it

14   activities the camera at the same time.

15   Q.    And the camera has both the video and audio

16   portion?

17   A.    Yes.

18   Q.    They're both activated at the same time?

19   A.    Yes, sir.

20   Q.    When Mr. Kyles was sitting in the vehicle, did

21   you believe he posed a risk of physical harm to you

22   or somebody else?

23   A.    No.

24   Q.    When Mr. Kyles exited the vehicle, did you

25   believe at the moment he exited, that he posed a

17

JUAN SIMENTAL - September 3, 2014

1    A.      By delaying my investigation at the location.

2    Q.      You read your report yesterday; correct?

3    A.      Yes, sir.

4    Q.      In your report you note several times that

5    Mr. Kyles continued to provoke, attempting to fight

6    you.

7            What did he do to provoke you?

8    A.      He challenged me to a fight.  He clenched his

9    fists.  He would not stand still.  He would walk

10   towards me, stop, back up.  Attempt to circle me and

11   walk back towards center, all the while, yelling

12   profanities.  Telling me to go fuck myself, to leave

13   the location.  The police had no business to be

14   there, and while his fists were clenched.

15   Q.      And in connection with his attempts to fight

16   you, were those different than the attempts to

17   provoke you or the same thing?

18   A.      I would say the same thing.

19   Q.      At some point you grabbed Mr. Kyles and

20   attempted to place his arm behind his back?

21   A.      Yes, sir.

22   Q.      What was your reason for doing that?

23   A.      To be detained.

24   Q.      And did you place -- strike that.

25           What purpose does placing a suspect's arm

35

JUAN SIMENTAL - September 3, 2014

1    did you have reasonable suspicion that Mr. Kyles was

2    engaged in criminal activity?

3    **A.      Repeat the question, please.**

4         MR. ROBINSON:  Could you read it back, please.

5

6         (Whereupon the record was read.)

7

8         MR. ROBINSON:  Thank you.

9         THE WITNESS:  One, I didn't know that was

10   Mr. Kyles prior to him exiting the vehicle.  And,

11   No. 2, that amount of time, it would have been less

12   than a second.  So I don't think I can answer that.

13        I know I did see him parked at the location.

14   So I was definitely going to talk to him.  There was

15   a vehicle in the driveway with no license plates.

16   Two subjects sitting in the car in the dark.  And I

17   hadn't taken a good look at the house yet.  From my

18   last experience, it was still a squatter house.  So I

19   think at that point I did have reason to detain both

20   of them.

21        MR. ALLEN:  The question was, did you have

22   reasonable suspicion?

23        THE WITNESS:  Yes.

24        MR. ROBINSON:

25   Q.    Okay.  What was that suspicion based on?

                                                          37

JUAN SIMENTAL - September 3, 2014

1    **A.     Based on the time of night, the location, the**

2    **lighting situation.  The vehicle had no plates on it.**

3    **It was a known squatter house.  There was a report of**

4    **illegal drug activity at the location.  There was**

5    **reports of fights in front of the location, and**

6    **reports of loiterers at the location as well.**

7    Q.    So let's talk about your knowledge of the

8    property.  We've already touched on this.

9         Prior to the November 30, 2011, you had found

10   illegal drugs in the property; right?

11   **A.     No, I did not say that.**

12   Q.    Had you ever arrested any people at the

13   property before?

14   **A.     Yes.**

15   Q.    For what crimes?

16   **A.     Trespassing, if I remember correctly.  That**

17   **happened -- I haven't looked it up before coming.**

18   Q.    And before November 30, 2011, had you ever

19   been witness to any fights or the remaining aftermath

20   at the 1906 Seaward property?

21   **A.     No, sir.**

22   Q.    Mr. Kyles at some point asked you if you were

23   arresting him; correct?

24   **A.     Yes.**

25   Q.    He also asked you -- well, he didn't.

38

JUAN SIMENTAL - September 3, 2014

1          When he asked you if you were arresting him,
2     did you respond to him?
3     A.      No, sir, I didn't.
4     Q.      Why not?
5     A.      Because it was the way he was acting, very
6     violent and threatening to use violence.  If I were
7     to place him under arrest, I didn't find it feasible
8     to let him know at that point without a cover officer
9     there for my safety and Mr. Kyles' safety.
10    Q.      Isn't it true, though, when you arrest
11    somebody, you have to tell them why you're arresting
12    them?
13             MR. ALLEN:  Objection.  Calls for a legal
14    conclusion.  You can answer.
15             THE WITNESS:  When feasible.
16             MR. ROBINSON:
17    Q.      I'm sorry?
18    A.      When feasible.
19    Q.      And in your estimation on November 30, 2011,
20    it was not feasible to tell Mr. Kyles why you were
21    arresting him; is that correct?
22    A.      At that point, yes, sir.
23    Q.      And before you arrested him but while you were
24    trying to detain him, did you tell Mr. Kyles why you
25    were detaining him?

                                                        39

JUAN SIMENTAL - September 3, 2014

1    A.    No.

2    Q.    And why is that?

3    A.    Prior to the taser camera turning on, I asked

4    basic questions -- I attempted to ask basic questions

5    as to what they were doing there.  He wouldn't

6    respond to any of them.

7    Q.    When you draw your taser and activated the

8    taser camera, was it your intention to detain him?

9    A.    Yes.

10   Q.    And did you tell him at that point why you

11   were detaining him?

12   A.    No.

13   Q.    And why not?

14   A.    Once, again, because of his mannerisms.  He

15   was very angry, threatening violence towards me from

16   the very beginning.  And there was no reason to

17   escalate the situation to a violent confrontation

18   between myself and Mr. Kyles without a cover officer

19   there.

20   Q.    Did you read Mr. Kyles' deposition transcript?

21   A.    No, sir, I did not.

22   Q.    Mr. Kyles testified -- I will represent to you

23   that Mr. Kyles testified during his deposition that

24   you may have approached him with a gun drawn.

25        My question is:  During this interaction, from

40

JUAN SIMENTAL - September 3, 2014

1     **A.     Yes, sir.**

2     Q.     Let's break it down.

3          How many times did you use the darts or the

4     projectiles on Mr. Kyles that evening?

5     **A.     Never.**

6     Q.     How many times did you press the taser against

7     Mr. Kyles' body attempting to discharge the taser on

8     to Mr. Kyles' body?

9     **A.     I would say approximately five times.**

10    Q.     How many times were you actually able to tase

11   Mr. Kyles?

12   **A.     The taser runs on a cycle of five seconds.  At**

13   **each incident that I'm referring to, the five times,**

14   **I would estimate that each time I was able to hold**

15   **the contact for approximately one second.**

16   Q.     Have you ever been tased?

17   **A.     Yes, sir.**

18   Q.     How many occasions?

19   **A.     Three.**

20   Q.     And when you were tased -- well, strike that.

21         Were each of those three occasions during your

22   training?

23   **A.     Yes, sir.**

24   Q.     And when you were tased?

25   **A.     Actually, I've been tased approximately five**

42

1    **A.      No, sir.**

2    Q.      In your report I noted, and I might be wrong,

3    that you did not indicate that you had been out to

4    the property on previous occasions, did you?

5    **A.      No, I did not.**

6    Q.      Why not?

7    **A.      That report would have probably read -- would**

8    **have been 100 pages long if that was the case.**

9    Q.      In reading your report at the -- strike that.

10            When you wrote your report, you did not

11    indicate that you had been out to the property at all

12    on prior occasions, did you?

13    **A.      No, sir.**

14    Q.      And the reason for that is?

15            MR. ALLEN:  Assumes there's a reason.  You can

16    answer.

17            THE WITNESS:  We typically don't include that

18    unless it's contact with somebody who's been there

19    before, particularly with domestic violence or things

20    of that sort.

21            MR. ROBINSON:

22    Q.      In your -- on the third -- the fourth page of

23    your report, page No. 4, first paragraph, you walked

24    towards Kyles and he began to yell at and told you to

25    leave; right?

52

1       A.     Go fuck myself.  Go fuck yourself, that's what

2    he said.

3       Q.     He said these words to you even before you

4    could explain why you were there; right?

5       A.     Yes, sir.

6       Q.     Did you again -- strike that.

7       Did you begin to ask Mr. Kyles routine

8    investigative questions?

9       A.     I attempted to.

10       Q.     What questions were you attempting to ask?

11       A.     What he was doing there.  If he knew who the

12    homeowner was.  What they were doing.

13       Q.     Did he answer any of your questions?

14       A.     No, sir.

15       Q.     In the second paragraph it reads, "Kyles would

16    walk towards me with clenched fists in an offensive

17    manner as to hit me and then would stop and take a

18    few steps back."

19       Did you feel threatened when Mr. Kyles

20    approached you or walked towards you with fists

21    clenched?

22       A.     I did.

23       Q.     You did?

24       A.     Yes, sir, to a certain degree, yes.

25       Q.     Then he would take a few steps back?

53

JUAN SIMENTAL - September 3, 2014

1    **A.      Yes, sir.**

2    Q.      Did you move towards him as he stepped back?

3    **A.      I don't remember.**

4    Q.      He challenged you telling you that he was

5    going to resist any arrest; right?

6    **A.      Yes, sir.**

7    Q.      He also challenged you telling you that he had

8    the right to fight back; correct?

9    **A.      Yes, sir.**

10   Q.      On November 30, 2011, was it your

11   understanding of the law that a person could resist

12   an unlawful arrest?

13           MR. ALLEN:  Objection.  Calls for a legal

14   conclusion.  You can answer.

15           THE WITNESS:  Sorry.  Could you repeat the

16   question?

17           MR. ROBINSON:  Yes.  With the objection noted

18   and preserved, could you please read the question

19   back, Madame Reporter.

20

21           (Whereupon the record was read.)

22

23           THE WITNESS:  No.

24           MR. ROBINSON:

25   Q.      As you sit here today, is it your

54

1    A.    Yes, sir.

2    Q.    How many times did he go down on the ground?

3    A.    Once.

4    Q.    How was it is that -- strike that.

5          How did he go to the ground?

6    A.    I attempted to -- by further deescalating the

7    situation, putting my taser way, giving him an

8    opportunity to submit to the arrest.  I grabbed his

9    right arm, at which time he again fought back towards

10   me.  And I leg swept him, causing him to fall to the

11   ground.

12   Q.    Did you use a right or left leg?

13   A.    I used my right leg me.

14   Q.    On his left leg; correct?

15   A.    My right leg on his right leg.

16   Q.    You went behind him directly?

17   A.    No.

18   Q.    Across?

19   A.    I was standing kind of a blade.  Then my

20   right -- I'm sorry.  My left hand was grasping his

21   right wrist.  My right hand was up towards his left

22   shoulder.  I used my right leg to sweep his right

23   leg.

24   Q.    Officer Saechao was present during that leg

25   sweep; right?

57

1    laying on his back or his side.  I don't remember

2    exactly.

3    Q.    But you were trying to place him on his

4    stomach; correct?

5    A.    Yes, sir.

6    Q.    And Officer Saechao was assisting in trying to

7    get Mr. Kyles on his stomach; correct?

8    A.    Yes, sir.

9    Q.    And Mr. Kyles began to punch at Officer

10   Saechao; correct?

11   A.    At both of us.

12   Q.    And which hand was he using to try and punch

13   at you?

14   A.    Both hands.

15   Q.    So at some point then you lost control of his

16   right arm; right?

17   A.    That's correct.

18   Q.    But while --

19         MR. ALLEN:  Assumes he ever had control of his

20   right arm.

21         MR. ROBINSON:

22   Q.    You lost your grip on his right arm.

23   A.    Yes, very, very early.

24   Q.    During this interaction with you and Officer

25   Saechao attempting to get Mr. Kyles to lay on his

JUAN SIMENTAL - September 3, 2014

1    stomach while Mr. Kyles was punching at both of you,

2    you were giving him commands, weren't you?

3    A.    Yes, sir.

4    Q.    What were you telling him to do?

5    A.    We were telling him to lie on his stomach and

6    place his hands behind his back.

7    Q.    It was your intent to place handcuffs on his

8    wrists?

9    A.    Yes, sir.

10   Q.    And that would mean you were taking him into

11   detention; right?

12   A.    Yes, sir.

13   Q.    At that point in time, if you had placed

14   handcuffs on his wrists, he would have been under

15   arrest --

16   A.    Yes.

17   Q.    -- for actively resisting; correct?

18   A.    Yes, sir, and delaying my investigation.

19   Q.    You were able to -- strike that.

20         You were able to briefly place Kyles on his

21   stomach, but he continued to fight you; right?

22   A.    Yes, sir.

23   Q.    How long did he spend on his stomach?

24   A.    Very short period of time.

25   Q.    And at some point you had a grip on his left

61

1    You were trying to get Kyles on his stomach;

2    correct?

3    **A.    Yes, sir.**

4    Q.    Where were you standing in connection with

5    Kyles when you tried to contact tase him in the

6    middle of his back?

7    **A.    I was more than likely on my knees right next**

8    **to him, attempting to grab ahold of his arm -- gain**

9    **control of his arm and place it behind his back.**

10    Q.    You were attempting to gain control of his

11    left arm at that time?

12    **A.    Yes, sir.**

13    Q.    Which hand were you using, your right or left

14    hand?

15    **A.    I believe I was using my left because I had**

16    **the taser in my right.**

17    Q.    You were left on left?

18    **A.    Correct.**

19    Q.    And are you right-handed?

20    **A.    I am.**

21    Q.    So you had your taser in your right hand, and

22    you placed it on the middle part of his back --

23    **A.    Yes, sir.**

24    Q.    -- between the shoulder blades?

25    **A.    Yes.**

63

JUAN SIMENTAL - September 3, 2014

1   Q.    And you attempted to discharge the taser;
2   correct?
3   A.    Without the cartridge.
4   Q.    Without the cartridge?
5   A.    Contact tase.
6   Q.    Mr. Kyles was able to either -- strike that.
7         How did Mr. Kyles prevent the five-second tase
8   from effecting him?
9   A.    He was still moving around and trying to sit
10  up on his buttocks and continue to resist --
11  fighting.
12  Q.    Did you see the blow from Mr. Kyles that
13  caused the scratch to appear at the top of the right
14  eye of Officer Saechao?
15  A.    Exact blow, no, I did not.
16  Q.    You saw Mr. Kyles swinging in that direction
17  of Officer Saechao?
18  A.    Yes, sir.
19  Q.    You go on to say in the third paragraph,
20  because Officer Saechao and you were the only
21  officers there at the time, "I discarded my taser and
22  grabbed Kyles with both hands."
23        What did you do to discard your taser?
24  A.    I just threw it.  Gave it a good toss to the
25  side.

64

1    A.    Yes, sir.

2    Q.    What was he doing to actively resist in the

3    moments before Xena was deployed on him?

4    A.    **He was refusing to place his hands behind his**

5    **back, even as Officer Saechao, and I had full grasp**

6    **of his arms and we were attempting to pull them out**

7    **from underneath his person.**

8    Q.    During your entire interaction with Mr. Kyles,

9    leading up to the point when Xena came into contact

10   with him, did you suspect Mr. Kyles had a weapon?

11   **A.    I did not know.**

12   Q.    So you were unsure; correct?

13   **A.    Yes.**

14   Q.    And in handcuffing Mr. Kyles, was it your

15   intent to attempt to prevent Mr. Kyles from using any

16   possible weapon that may be in the vicinity?

17   **A.    Yes, sir.**

18   Q.    After you arrested Mr. Kyles or were able to

19   place him in handcuffs, did you search him?

20   **A.    Yes, sir.**

21   Q.    Did you find any weapons?

22   **A.    No, sir.**

23   Q.    Did you find any illegal drugs on him?

24   **A.    No, sir.**

25   Q.    Going down, still on page 5, you struck

71

1    Mr. Kyles approximately two times on his left tricep;

2    correct?

3    A.      Yes, sir.

4    Q.      That's using the flashlight?

5    A.      Right.

6    Q.      The purpose of striking Mr. Kyles was to

7    effect what?

8    A.      To loosen his wrists -- I'm sorry.  Loosen his

9    grasp so I could gain control of his arm.

10   Q.      When you say "loosen his grasp," what was he

11   grasping?

12   A.      His hand.

13   Q.      So he had his arms tucked in front of him

14   laying on the ground; right?

15   A.      Near his waistband, yes, underneath.

16   Q.      Laying on his stomach?

17   A.      Yes.

18   Q.      And you struck his left tricep twice and were

19   able to successfully free the left arm; correct?

20   A.      Yes, sir.

21   Q.      And then Officer Saechao was able to get

22   control of the right arm; correct?

23   A.      Yes, sir.

24   Q.      And you placed Mr. Kyles in handcuffs; right?

25   A.      Yes, sir.

                                                           72

JUAN SIMENTAL - September 3, 2014

1    STATE OF CALIFORNIA      )  SS

2             I do hereby certify that the witness in

3       the foregoing deposition was by me duly sworn to

4       testify to the truth, the whole truth, and nothing

5       but the truth in the within-entitled cause; that

6       said deposition was taken at the time and place

7       therein stated; that the testimony of said witness

8       was reported by me, a certified shorthand reporter

9       and a disinterested person, and was under my

10      supervision thereafter transcribed into typewriting,

11      and when so transcribed was carefully read to or by

12      the said witness, and, being in every desire, was

13      thereafter by the said witness duly subscribed; that

14      if unsigned by the witness, signature has been

15      waived in accordance with stipulation between

16      counsel for the respective parties.

17             And I further certify that I am not of

18      counsel or attorney for either or any of the parties

19      to said deposition nor in any way interested in the

20      outcome of the cause named in said caption.

21             IN WITNESS WHEREOF, I have hereunder subscribed my

22         hand on the  16th day of  September 2014.

23

24      _____

         COLLEEN ALVARADO
25       Certified Shorthand Reporter

                                                    84