# EXHIBIT "B"

```
1                UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF CALIFORNIA
3                          ---oOo---
4   BRUCE C. KYLES,
5        Plaintiff,
6   vs.                              No.  C-13-4695-WHO
7   CITY OF PITTSBURG, et al.,
8        Defendants.
9   _____/
10
11
12
13
14              DEPOSITION OF BRUCE C. KYLES
15
16      Taken before KIMBERLEY RICHARDSON, RPR, CCRR
17                      CSR No. 5915
18                     August 7, 2014
19
20
21
22
23           Aiken Welch Court Reporting
             One Kaiser Plaza, Suite 250
24           Oakland, California  94612
             (510) 451-1580/(877) 451-1580
25                Fax (510) 451-3797
                  www.aikenwelch.com
```

```
 1                    I N D E X
 2                                              PAGE
 3   EXAMINATION BY MR. ALLEN                     5
 4
 5
 6
 7
 8
 9
10
11                   E X H I B I T S
12   DEFENDANTS'                                PAGE
13   Exhibit A    Mr. Kyles's Responses to        92
                  Defendants' First Set of
14                Special Interrogatories
15
16
17
18
19
20
21
22
23
24
25
```

```
1        Q.  Okay.  So you're getting out of the car.  She
2   said an officer's approaching, and then please
3   continue.
4        A.  At that point I look back, and I keep walking.
5   Then I noticed the officer getting out of the car as
6   he's pulling his weapon.
7        Q.  What weapon did he pull out?
8        A.  He pulled -- his gun.  He pulled a gun.
9        Q.  What position was the gun in?
10           MR. ROBINSON:  Vague as to time.
11  BY MR. ALLEN:
12       Q.  At the moment in time the officer gets out of
13  the vehicle and you observe him withdraw the weapon,
14  what position was the gun in?
15       A.  He had it pointed at me.
16       Q.  In between the time the officer got out of the
17  vehicle and pointed his gun at you, did he say
18  anything?
19       A.  "Get on the ground."
20       Q.  And did you hear that?  You heard that command;
21  yes?
22       A.  Yes.
23       Q.  You understood that command?
24       A.  Yes.
25       Q.  What did you do?
```

1    A.  I asked him "Why should I get on the ground?
2  What did I do?"
3    Q.  And what did he say in response?
4    A.  "Get on the ground."
5    Q.  What happened next?
6    A.  Same response.  I asked him why.
7        About this time he notices Ms. Lopez on the
8  other side of the car.  But I'm agitated that there's a
9  gun in my face, and I haven't done anything.
10   Q.  Okay.  What happens next?
11   A.  The officer's still telling me to get on the
12 ground, and I tell him, I says, "I can't get on the
13 ground.  Let's go to your car."  And I start walking
14 towards his car at this point.
15   Q.  Why did you say you couldn't get on the ground?
16   A.  Because I've had -- I had a motorcycle accident
17 back in '84, 1984, and I broke my hip and pelvis in
18 like eight different spots so --
19   Q.  And did you inform the officer that you were
20 physically incapable of getting on the ground?
21   A.  No.
22   Q.  Is there a reason you did not inform him of
23 that?
24   A.  No.
25   Q.  So what happens next?

1    A.   The officer never did tell me why he wanted me
2    to get on the ground or what I was being accosted for,
3    so I started walking towards his car with him, and then
4    I vaguely remember I got hit with the -- it felt like I
5    got hit by something and smacked me, and I guess it was
6    the Taser, and I was on the ground.
7         Q.   Did the officer command you to come towards his
8    car?
9         A.   I was on the ground.
10        Q.   No.  I'm going back a few moments in time when
11   you said you began walking towards the vehicle.
12        A.   No.
13        Q.   And then you felt the strike.  So I'm wondering
14   did the officer command you to approach his vehicle?
15        A.   No.
16        Q.   As you're approaching the vehicle, you feel a
17   strike of some sort; is that fair?
18        A.   I'm walking away from the officer when I feel
19   the strike.  His car is to our rear.
20        Q.   Very good.  I did not ask you for position.
21             So, in relation to his car, where is the
22   officer standing?
23        A.   He's to my left.  The car is now to my rear.
24        Q.   As you're standing there, the officer is to
25   your left, and the car is to your rear?

```
1   falling.
2   BY MR. ALLEN:
3        Q.  You remember falling.  You don't remember
4   how -- what part of your body first came in contact
5   with the ground?
6        A.  It was all of it.
7        Q.  Your front, your back or your side?
8        A.  It was my front.
9        Q.  Do you recall what part of the front part of
10  your body hit the ground first?
11       A.  Shoulder.
12       Q.  And after your -- was it your left or right
13  shoulder that hit the ground first?
14       A.  I can't be sure.  I'm not sure.
15       Q.  After one of your shoulders hit the ground,
16  what hit the ground next?
17       A.  I don't remember.
18       Q.  Where were your arms as you were falling?
19       A.  Connected to my shoulders.
20       Q.  Did your hands break the fall?
21       A.  I don't think so, no.
22       Q.  After you're on the ground --
23       A.  Excuse me, I remember being stunned, and that's
24  the reason why my arm couldn't break my fall because I
25  was in a shaking mode from the Taser.  I remember
```

```
 1   shaking.
 2        Q.   Do you remember how long after you felt the
 3   Taser contact until you hit the ground?
 4        A.   Maybe one thousand and one.
 5        Q.   And after you hit the ground, what happens
 6   next?
 7        A.   I remember shaking.  And then I really can't
 8   remember.  I remember shaking.  It's a lot of -- it was
 9   really fuzzy.  I remember my body convulsing.  And then
10   I heard the command of "sic 'em," and a whole new pain
11   began.
12        Q.   So after you fall to the ground and you feel
13   the shaking and you feel the pain, the next thing you
14   recall is hearing "sic 'em"?
15        A.   Yes.
16        Q.   At that time were other -- did you see other
17   officers on scene?
18        A.   I couldn't see any officers.
19        Q.   Where were you looking when you were on the
20   ground?  What direction were you facing?
21        A.   I was facing down.
22        Q.   Oh, your --
23        A.   My chest was on the ground.  I was face down.
24        Q.   Got you.  Thank you.
25             Before you believe you were Tased, did you hear
```

```
1    interaction with that officer before?
2         A.   Never.
3         Q.   You're on the ground.  You hear the command
4    "sic 'em."  Before you hear that command, did you hear
5    any other commands issued to you?
6         A.   I was shaking.  I don't remember.  I don't
7    remember hearing any other commands.  I couldn't
8    understand why.
9         Q.   Describe your conduct for me, please, from the
10   time that you interacted with the officer until you hit
11   the ground.  I know that you said you had engaged in a
12   verbal exchange.  You had begun to walk toward the
13   officer's vehicle.  Any other conduct you engaged in
14   from the time you first saw the officer until you hit
15   the ground?
16        A.   Just verbal.  It was all verbal.  Basically I
17   was just letting the officer know that I do have
18   rights.  "I should have a right to know why you're
19   stopping me, why you want me to get on the ground.
20   What have I done?"
21             And to these he gave me no reply except for
22   "Get on the ground."
23        Q.   So you're on the ground, and you hear "sic
24   'em."  What happens next?
25        A.   I scream.
```

```
 1      Q.  Do you know what happened?
 2      A.  The dog was ripping my leg up.
 3      Q.  Had you been aware of the police dog's presence
 4  before you heard the command "sic em"?
 5      A.  No.
 6      Q.  You hadn't heard the dog?
 7      A.  No.
 8      Q.  Where did the dog bite you, if you know?
 9      A.  My left calf.
10      Q.  After the dog bites you, what happens?
11      A.  I was shaking, and the officers are screaming.
12  I can't understand anybody.  And they're siccing the
13  dog on me.  That's basically it.  That's -- once they
14  sicced the dog on me, the dog wouldn't stop.  The dog
15  sort of went crazy.
16      Q.  Do you know how long the dog bit you?
17      A.  About a minute and a half.
18      Q.  Did the dog bite you anywhere other than the
19  left calf?
20      A.  All over the lower part of my left leg bites.
21      Q.  Is it your contention that the dog would
22  release and bite somewhere else?
23      A.  Yes.
24      Q.  At any time did you punch the dog?
25      A.  No.
```

```
 1        A.   Yes.
 2        Q.   Were both arms grabbed about the same time?
 3        A.   I think they had already had hold of me at the
 4   time that the dog was attacking me.
 5        Q.   Well, this is an important chronological
 6   distinction.  Was your arms grabbed at the moment the
 7   dog's bite commenced or were your arms grabbed before
 8   the dog's bite commenced or were your arms grabbed
 9   after the dog's bite commenced?
10        A.   Can you say that again?
11             MR. ROBINSON:  Maybe I could help here.  What
12   happened first or did they happen at the same time?
13             THE WITNESS:  I was on the ground, and I
14   remember the officer being here, and I remember the
15   dog.  That's as far as I can go.  My field of vision
16   was like this because of something being on the back of
17   my neck.
18   BY MR. ALLEN:
19        Q.   Do you know if your arms were grabbed before,
20   about the same time or after the dog started biting?
21        A.   After.
22        Q.   Do you know if the -- whatever pressure was put
23   on you in the back of your neck, do you know whether
24   that pressure was applied before, about the same time
25   or after the dog began biting?
```

```
1        A.   It was after.
2        Q.   Do you know which officer applied the pressure
3   to your neck?
4        A.   I couldn't see his foot.
5        Q.   At any time after the incident, did you learn
6   which officer applied the pressure to your neck?
7        A.   No.
8        Q.   And why do you believe it was a foot that was
9   pressed to the back of your neck?
10       A.   Because of the weight that was on the foot and
11  the way it was pushing my head down, my neck.  It felt
12  like a foot.  If it wasn't, it was a pretty big hand.
13       Q.   Fair enough.
14            Any other force -- during the course of the dog
15  bite, was any force administered?
16       A.   I remember getting hit with the flashlight.
17       Q.   Any other force administered during the dog
18  bite?
19       A.   No.
20       Q.   How many times would you believe that you
21  were -- were you struck with a flashlight or how was
22  the force administered by the flashlight?
23       A.   Maybe three or four times, bop, bop, bop.  He
24  was trying to get some kind of understanding out of me,
25  and I wasn't hearing anything, I guess.
```

```
 1        Q.   You believe you were struck three or four times
 2   because you were not understanding the officer?
 3        A.   Because I couldn't understand, yeah.  We wasn't
 4   communicating.
 5        Q.   Was the officer speaking English?
 6        A.   No.  He was just assaulting me.
 7             MR. ROBINSON:  Well, no, in connection with his
 8   verbal communications, was it English as far as you
 9   know?
10             THE WITNESS:  Yes, yes, it was English.
11   BY MR. ALLEN:
12        Q.   Before the flashlight strikes were
13   administered, what command was the officer saying?
14        A.   They were still talking, "Get on the ground."
15   The whole incident was dealing with them trying to get
16   me into a position to where I was submissive, and I'm
17   trying to understand why I'm being accosted in the
18   first place.
19             MR. ALLEN:  Motion to strike those portions
20   that are speculative.
21   BY MR. ALLEN:
22        Q.   Where were you struck with the flashlight?
23        A.   My head.
24        Q.   Where on your head?
25        A.   There was a lump.
```

```
 1   STATE OF CALIFORNIA     )
 2                           )    ss.
 3   COUNTY OF ALAMEDA       )
 4
 5          I, KIMBERLEY RICHARDSON, a Shorthand Reporter,
 6   State of California, do hereby certify:
 7          That BRUCE C. KYLES, in the foregoing
 8   deposition named, was present and by me sworn as a
 9   witness in the above-entitled action at the time and
10   place therein specified;
11          That said deposition was taken before me at
12   said time and place, and was taken down in shorthand by
13   me, a Certified Shorthand Reporter of the State of
14   California, and was thereafter transcribed into
15   typewriting, and that the foregoing transcript
16   constitutes a full, true and correct report of said
17   deposition and of the proceedings that took place;
18          That before completion of the proceedings,
19   review of the transcript was not requested.
20          IN WITNESS WHEREOF, I have hereunder subscribed
21   my hand this 18th day of August 2014.
22                  [signature]
23                  _____
                    KIMBERLEY RICHARDSON, CSR NO. 5915
24                  State of California
25
```