1

2

3

4    UNITED STATES DISTRICT COURT

5    NORTHERN DISTRICT OF CALIFORNIA

6

7    BRUCE COLUMBUS KYLES,                    Case No. 13-cv-04695-WHO

          Plaintiff,

8

     v.                                        **ORDER GRANTING IN PART AND**
9                                              **DENYING IN PART DEFENDANTS'**
     AARON BAKER, et al.,                      **MOTION FOR SUMMARY JUDGMENT**
10
          Defendants.                          Re: Dkt. No. 24
11

12

13                            **INTRODUCTION**

14          During an encounter with Pittsburg, California police officers on November 30, 2011,

15   plaintiff Bruce Kyles was forced to the ground, tased multiple times, struck with a flashlight, and

16   mauled by a police dog before being arrested and charged under California Penal Code sections 69

17   and 148(a)(1). Kyles claims the officers' use of force against him was unprovoked; the officers

18   assert that Kyles was verbally and physically resisting throughout the encounter. After entering a

19   plea of no contest to the section 148(a)(1) charge, Kyles brought a civil rights action against the

20   City of Pittsburg and the arresting officers, alleging unlawful arrest and excessive force under 42

21   U.S.C. § 1983 and state law causes of action for negligence, assault, and battery. Defendants now

22   move for summary judgment on several grounds, including that under *Heck v. Humphrey*, 512

23   U.S. 477 (1994), Kyles's claims are barred by his section 148(a)(1) conviction. Because I

24   conclude that Kyles's excessive force claims are not barred under *Heck*, and that there are triable

25   issues of fact as to whether the officers are entitled to qualified immunity on these claims, the

26   motion is GRANTED IN PART and DENIED IN PART.

27

28

# BACKGROUND

## I.  FACTUAL BACKGROUND

### A.  Officers' Version of Events

Officers Juan Simental, Chunliam Saechao, and Gabriel Palma, the three police officers who participated in Kyles's arrest, testified as follows in their depositions:

On the night of November 30, 2011, Simental was dispatched to 1906 Seward Drive, Pittsburg, California in response to a call reporting a history of suspected drug activity and physical fighting in front of the residence located at that address.  Simental Depo. at 12-13 (Allen Decl., Ex. A, Dkt. No. 25).  The caller did not report that any criminal conduct was occurring at that moment, only that there had been a number of complaints of suspected criminal conduct at that address in the past.  *Id.*  When Simental arrived, he observed a brown sedan without license plates parked in the residence's driveway.  *Id.* at 13.  Two people were sitting in the sedan.  *Id.*  Simental sent a broadcast over his police radio reporting that he was about to make contact with two individuals.  Saechao Depo. at 16 (Allen Decl., Ex. C., Dkt. No 25).  As Simental exited his patrol vehicle, a black male, who Simental immediately recognized as Kyles, exited the sedan.  Simental Depo. at 14.  Simental had arrested Kyles on a prior occasion and "knew he was violent towards police . . . [Kyles] is a fighter.  He likes to fight the police."  *Id.* at 11.

Kyles became combative as soon as he exited the sedan.  *Id.* at 14.  Kyles repeatedly threatened to fight if Simental attempted to arrest him.  *Id.* at 16-17.  Kyles "would not stand still." *Id.* at 35.  He would walk towards Simental with his fists clenched, then stop and back up, then walk towards Simental again, "all the while yelling profanities" and "challenging [Simental] to a fight." *Id.* at 17, 35.  In response to Kyles's demeanor, Simental withdrew his taser from his belt. *Id.* at 17.  After Kyles had threatened to fight Simental approximately five times, Simental decided to arrest him for interfering with Simental's investigation of the 1906 Seward Drive residence.  *Id.* at 15-16.  Simental put his taser away and grabbed Kyles's right arm to arrest him.  *Id.* at 57.  Kyles resisted, so Simental used a "leg sweep" to force Kyles to the ground.  *Id.*

Saechao responded to Simental's broadcast and was the next police officer to arrive on the scene.  Saechao Depo. at 16.  The first thing Saechao saw as he arrived was Simental and Kyles

2

1    falling to the ground.  *Id.*  Saechao was still driving in his vehicle at this point and could not see

2    exactly how or why they fell.  *Id.*  After Saechao exited his vehicle, he saw Kyles leaning over on

3    his right side and swinging his left arm in Simental's direction without actually making physical

4    contact with Simental.  *Id.* at 19.  Simental was kneeling next to Kyles and trying to hold him

5    down.  *Id.*  Saechao ran over and grabbed Kyles's right arm.  *Id.* at 23.  Kyles was still leaning

6    over on his right side, so his right arm "was kind of underneath him a little bit."  *Id.*  Saechao

7    "yanked [Kyles's right arm] out from underneath him [and] tried to place [it] behind his back."  *Id.*

8    Kyles continued to resist, and Saechao could not control Kyles's right arm.  *Id.* at 25.  Simental,

9    who had grabbed Kyles's left arm, also lost control of that arm.  *Id.* at 25.

10        Simental decided to tase Kyles at this point.  Saechao Depo. at 25.  Simental placed the

11   taser on the middle part of Kyles's back, between his shoulder blades, and deployed the taser

12   without a cartridge, in "contact tase" mode.  Simental Depo. at 63-64.  Simental tased Kyles five

13   times in quick succession but could not complete a normal, five-second tase because Kyles

14   continued to move around, resisting.  *Id.* at 42, 64.  Each tase that Simental administered lasted

15   only about one second.  *Id.* at 42.  After the first tase, Kyles "was jerking his body very violently."

16   Saechao Depo. at 26.  Saechao testified at his deposition that Kyles's jerking initially might have

17   been an involuntary reaction to the tase, but that "you regain…control of your body" once a tase

18   has stopped, and that Kyles became "extremely violent and angry" after the taser was removed

19   from his body.  *Id.* at 26, 28.  Kyles sat up and began swinging both fists at Simental and Saechao.

20   *Id.* at 27.  One of his fists struck Saechao's forehead, breaking the skin and drawing blood.  *Id.* at

21   28-29.  Saechao told Kyles multiple times to "stop resisting" and "put his arms behind his back."

22   *Id.* at 40.

23        Palma and his police dog, Xena, arrived on the scene at about this time.  *Id.* at 27-28.  Like

24   Saechao, Palma came in response to Simental's radio broadcast.  Palma Depo. at 23 (Allen Decl.,

25   Ex. E, Dkt. No. 25).  Palma was driving a marked K-9 police vehicle that night, and Xena was in

26   the vehicle with him when he received the broadcast.  *Id.* at 24.  As he pulled up to the 1906

27   Seward Drive residence, Palma observed Simental and Saechao struggling with Kyles.  *Id.* at 27.

28   Palma testified in his deposition that Kyles was laying on his back on the ground with Simental

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1   and Saechao kneeling on either side of him.  *Id.* at 27.  Palma stated that "it looked like Officer

2   Simental [was] attempting to . . . dry tase Kyles with a taser [and] Kyles [was] aggressively

3   punching towards the officers."  *Id.* at 27.  "Dry tase" is another term for "contact tase."  *Id.*

4        Palma decided to deploy Xena.  *Id.* at 29.  Palma testified that he made this decision

5   because, as he was putting a leash on Xena, he saw that Kyles was now lying on his stomach "with

6   his hands tucked underneath his body toward the midline of his body."  *Id.* at 29.  Kyles was "not

7   removing his hands from the midline of his body," and Palma feared that Kyles was attempting to

8   retrieve a weapon from that area.  *Id.* at 29.  Palma admitted in his deposition that he did not see a

9   weapon on Kyles and that neither Simental nor Saechao indicated that Kyles had a weapon.  *Id.* at

10  30.

11       Xena bit onto Kyles's left leg and continued biting for the next approximately thirty

12  seconds.  Palma Depo. at 55-56.  During that time, Simental used a flashlight to strike Kyles

13  approximately two times on his left arm in an effort to gain control of that arm, which was still

14  tucked beneath Kyles's body.  Simental Depo. at 71-72.  Simental then gained control of Kyles's

15  left arm, while Saechao gained control of his right arm.  Saechao Depo. at 36.  After Kyles was

16  placed in handcuffs, Palma ordered Xena to release Kyles's leg, which she did.  Palma Depo. at

17  55.  The officers did not find any weapons or contraband on Kyles after arresting him.   Simental

18  Depo. at 71.

19       Saechao accompanied Kyles to the county hospital in Martinez, California.  Saechao Depo.

20  at 43-44.  While at the hospital, Kyles spontaneously told Saecho multiple times that he had been

21  unlawfully arrested, and that he had the right to resist an unlawful arrest.  *Id.* at 44.  According to a

22  declaration submitted by Saechao, Kyles also said that he became "enraged" after he was tased

23  and could not specifically remember what he did, although he did remember that he had fought

24  with the police and that he "could not control himself."  Saecho Decl. ¶ 4 (Dkt. No. 28).

25       **B.  Kyles's Version of Events**

26       Kyles's version of events aligns with the officers' in certain ways and varies markedly in

27  others.  In a declaration submitted in support of his opposition brief, Kyles states that when he first

28  exited the sedan parked in the driveway at 1906 Seward Drive, Simental had already drawn his

United States District Court
Northern District of California

1    firearm and was pointing it at Kyles.  Kyles Decl. ¶ 4 (Dkt. No. 37).  Simental did not inform

2    Kyles why he was detaining or arresting him, did not ask Kyles whether he was on probation or

3    parole, and did not address Kyles by name.  *Id.*  Simental told Kyles to "turn the fuck around" and

4    to place his hands on his head.  *Id.*  Kyles states that he did not threaten Simental or clench his

5    fists; rather, Kyles "asked [Simental] repeatedly why he was coming at me."  *Id.* (internal

6    quotation marks omitted).  Although Simental did not respond to Kyles's question, Kyles agreed

7    to walk with him over to the police vehicle.  *Id.*  Simental then "attacked" Kyles and began to tase

8    him.  *Id.*

9         Kyles states that he was not warned that he was going to be tased.  *Id.* ¶ 6.  Each time he

10   was tased, he "lost control of [his] limbs and muscles" and "jerked several times involuntarily in

11   response."  *Id.*  Kyles begged the officers to stop tasing him.  He had already submitted to being

12   taken into custody when Xena was deployed.  *Id.* ¶ 6-8.  Kyles states that "[t]he problem was that

13   [the officers] were almost constantly tasing me, causing me to jerk involuntarily in reaction to

14   being tased."  *Id.* ¶ 8.  Kyles states that he did not strike the officers.  *Id.* ¶ 7.

15        According to Kyles's declaration, he was not warned that Xena was going to be deployed.

16   *Id.* ¶ 9.  The declaration states:  "Palma never warned me that [the officers] were going to use a

17   police dog against me.  No warnings were given.  All of a sudden, the dog was ripping at my left

18   leg, causing extreme pain."  *Id.*  By this time, Kyles "was trying to move [his] arms from

19   underneath [his] body, but the lasting effect of the taser attacks prevented [him] from being able to

20   move [his] arms because [he] was physically . . . exhausted."  *Id.* ¶ 9.  Kyles states that his only

21   movements while Xena was biting him "were involuntary reactions to the extreme pain in my left

22   leg.  I was not kicking at the dog.  I was not resisting."  *Id.* ¶ 11.  As Xena was biting his leg,

23   Kyles heard one of the officers say "something like, 'Good girl.'"  *Id.*

24        At some point during the altercation, there was a knee or foot pressed against the back of

25   Kyles's head, and he was struck on his arm several times with what he believes was a flashlight.

26   *Id.* ¶ 10.  Kyles states that he was also struck at least once on his head with an unidentified heavy

27   object.  *Id.*

28        Kyles had several medical procedures performed over the course of the next month.  *Id.* ¶

12. Due to the dog bites, he suffered a serious infection and was forced to undergo surgery on his previously damaged right hip. *Id.* Kyles denies the admissions Saechao claims he made while in the hospital. *Id.* ¶ 13. Kyles states that Saechao attempted to initiate conversation with him but that he "just sat and listened to [Saechao] talk." *Id.* Kyles "was in too much pain and was exhausted." *Id.*

### C. Video and Photographic Evidence

Defendants submitted an excerpt from the video recorded during the incident by Simental's taser camera. Allen Decl., Ex. D (Dkt. No. 25). The video is in black and white. During the first thirty to forty seconds, the camera moves around rapidly, and the visual is mostly a blur. There is a continuous crackling and buzzing sound, which defendants describe as the "arc'ing" of Simental's taser. *See, e.g.,* Mot. 3, 15. A voice that appears to belong to Kyles grunts and shouts indistinctly. At approximately fifteen seconds, the voice appears to say, "Come on man, stop."

At approximately forty seconds, the taser is set on the ground and the camera sits still, facing towards a police vehicle parked in the background. The foreground is empty; Kyles and the officers appear to be positioned behind the camera. An officer holding a dog by the leash walks across the screen. The dog barks, and multiple voices begin to shout. Between approximately fifty-three and ninety-eight seconds, different, overlapping voices can be heard repeatedly shouting, "Put your hands behind your back," "Stop resisting," "Good girl," and, "Get it off." The voice that appears to belong to Kyles screams several times during that time span.

In support of his opposition brief, Kyles submitted eleven photographs taken the night of November 30, 2011 after his arrest. Kyles Decl., Exs. 1-11. The photographs depict Kyles lying down, either on the ground or in a hospital bed, and focus mostly on his left leg. The close-ups show a large, ragged hole, approximately six inches across and one inch deep, torn from his calf.

### D. State Court Criminal Proceedings

Based on the November 30, 2011 incident, Kyles was charged in the Superior Court of California, Contra Costa County, under California Penal Code sections 69 and 148(a)(1). RJN,

Exs. A, C (Dkt. No. 29).[1]  On April 18, 2012, Kyles entered a plea of no contest to the section

148(a)(1) charge.  RJN, Ex C.  Section 148(a)(1), a misdemeanor, makes punishable "[e]very

person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or

attempt to discharge any duty of his or her office or employment."  Cal. Penal Code § 148(a)(1).

## II.  PROCEDURAL BACKGROUND

Kyles filed an initial action based on the above-described incident on April 23, 2012 but,

for reasons not relevant here, voluntarily dismissed his claims without prejudice on October 9,

2013.  *Kyles v. Baker*, No. 12-cv-02016-WHO (N.D. Cal. Apr. 23, 2014), Dkt. Nos. 1, 19.  On the

same date, Kyles filed the complaint in the instant case.  Dkt. No. 1.  The complaint names as

defendants the City of Pittsburg, the Pittsburg Police Department, Officers Simental, Saechao, and

Palma, Sergeant Robert Semas, and Aaron Baker, the former chief of the Pittsburg Police

Department.  *Id.*  The complaint alleges causes of action under 42 U.S.C. § 1983 for unlawful

arrest,[2] excessive force, and conspiracy in violation of the Fourth and Fourteenth Amendments and

asserts that defendants committed their constitutional violations pursuant to a municipal policy,

practice and/or custom.  The complaint also includes state law tort claims for negligence, assault,

---

[1] Defendants request judicial notice of the warrant for Kyles's arrest based on the November 30, 2011 incident, the amended information from his subsequent criminal prosecution for violations of sections 69 and 148(a)(1), and documentation of his no contest plea to the section 148(a)(1) charge.  Dkt. No. 29.  Because these court documents are appropriate subjects of judicial notice under Federal Rule of Evidence 201(b)(2), the request is GRANTED.

[2] The complaint alleges causes of action for both unlawful arrest and unreasonable seizure in violation of the Fourth Amendment.  As defendants point out in their reply brief, these claims are duplicative.  Courts generally treat an unlawful arrest as one manner of violating the Fourth Amendment prohibition on unreasonable seizures.  *See, e.g., Myers v. City & Cnty. of San Francisco*, No. 08-cv-01163-MEJ, 2012 WL 4111912, at *4 n.12 (N.D. Cal. Sept. 18, 2012) ("There are sufficient facts in the record that may lead a rational juror to conclude that [defendant] was involved in [plaintiff's] alleged unlawful arrest, which would constitute a Fourth Amendment violation for an unreasonable seizure."); *Elkins v. Washington Cnty.*, No. 06-cv-00448, 2007 WL 1342155, at *5 (D. Or. May 3, 2007) ("A false or unlawful arrest is treated as a claim of unreasonable seizure of the person through the Fourth Amendment to the United States Constitution.")  Kyles does not explain in either his complaint or his brief why he has alleged claims for both unlawful arrest and unreasonable seizure.  Accordingly, for the purposes of this motion, I consider Kyles's unlawful arrest and unreasonable seizure claims under a single, "unlawful arrest" analysis.

United States District Court
Northern District of California

1   and battery.  On October 16, 2014, Kyles voluntarily dismissed with prejudice the Pittsburg Police

2   Department, Sergeant Robert Semas, and Aaron Baker, as well as his claims for conspiracy and

3   violation of the Fourteenth Amendment.  Dkt. No. 48.  Kyles left intact his Fourth Amendment

4   and state law tort claims against the City of Pittsburg, Simental, Saechao, and Palma.

5       Defendants filed their summary judgment motion on September 17, 2014.  Dkt. No. 24.  I

6   heard argument from the parties on October 22, 2014.

7                                   **LEGAL STANDARD**

8       Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate

9   that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a

10  matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine if it could reasonably be resolved in

11  favor of either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is

12  material where it could affect the outcome of the case.  *Id.*

13      The party moving for summary judgment has the initial burden of demonstrating the

14  absence of a genuine issue of material fact as to an essential element of the nonmoving party's

15  claim.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).  Once the movant has made this

16  showing, the burden shifts to the nonmoving party to identify specific evidence showing there is a

17  genuine issue of material fact for trial.  *Id.*  If the nonmoving party cannot do so, the movant "is

18  entitled to . . . judgment as a matter of law because the nonmoving party has failed to make a

19  sufficient showing on an essential element of her case." *Id.* (internal quotations omitted).

20      On summary judgment, the court draws all reasonable factual inferences in favor of the

21  nonmoving party.  *Anderson*, 477 U.S. at 255.  "Credibility determinations, the weighing of the

22  evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

23  judge." *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact

24  and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594

25  F.2d 730, 738-39 (9th Cir. 1979).

26

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

**DISCUSSION**

## I. EVIDENTIARY OBJECTIONS

1        Federal Rule of Civil Procedure 56(c)(2) allows a party to "object that the material cited to

2   support or dispute a fact cannot be presented in a form that would be admissible in evidence."

3   Fed. R. Civ. P. 56(c)(2).  Defendants object to three declarations submitted by Kyles in support of

4   his opposition to defendants' summary judgment motion.  Kyles objects to two exhibits submitted

5   by defendants.

### A.  Declaration of Bruce C. Kyles

6        Defendants argue that certain portions of Kyles's declaration should be stricken under the

7   "sham affidavit rule."  Reply 12-13.  Defendants base this argument on *Kennedy v. Allied Mut.*

8   *Ins. Co.*, 952 F.2d 262 (9th Cir. 1991), in which the Ninth Circuit stated that "a party cannot create

9   an issue of fact by an affidavit contradicting his prior deposition testimony." *Id.* at 266.  The court

10  in *Kennedy* went on to hold, however, that this general rule "does not automatically dispose of

11  every case in which a contradictory affidavit is introduced to explain portions of earlier deposition

12  testimony." *Id.* at 266-67.  Before striking a contradictory affidavit, "the district court must make

13  a factual determination that the contradiction was actually a sham." *Id.* at 267 (internal quotation

14  marks omitted).

15       Since *Kennedy*, the Ninth Circuit has imposed a second requirement for application of the

16  sham affidavit rule: that the inconsistency between the party's prior deposition testimony and his

17  subsequent affidavit be "clear and unambiguous."  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989,

18  998-99 (9th Cir. 2009).  "[M]inor inconsistences that result from an honest discrepancy, a mistake,

19  or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* at 999.

20  The Ninth Circuit has also instructed that the sham affidavit rule "should be applied with caution,"

21  because "aggressive invocation of the rule . . . threatens to ensnare parties who may have simply

22  been confused during their deposition testimony and may encourage gamesmanship by opposing

23  attorneys." *Id.* at 998; *see also, Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("[T]he

24  sham affidavit rule should be applied with caution because it is in tension with the principle that

25  the court is not to make credibility determinations when granting or denying summary judgment.")

1    (internal quotation marks omitted).

2          Application of the sham affidavit rule is not warranted here.  Defendants assert the

3    following inconsistencies in Kyles's declaration:  (1) Paragraph 4 of the declaration includes

4    additional information not included in Kyles's deposition testimony – for example, the assertion

5    that Simental did not ask Kyles whether he was on probation or parole.  Kyles Decl. ¶ 4; Kyles

6    Depo. at 32-34.  (2) Kyles's statement in his declaration that he begged the officers to stop tasing

7    him contradicts his deposition testimony that he "really can't remember" everything about what

8    happened when he was being tased and that "it was really fuzzy."  Kyles Decl. ¶ 6; Kyles Depo. at

9    40.  (3) Kyles's claim in his declaration that he had submitted to being taken into custody when

10   Xena was deployed contradicts his deposition testimony that "the whole incident" was about the

11   officers "trying to get me into a position where I was submissive."  Kyles Decl. ¶¶ 8-9, 11; Kyles

12   Depo. at 50.  (4) Kyles's denial in his declaration that he made admissions to Saechao while in the

13   hospital "violates the spirit of the sham affidavit rule" because Kyles is "taking a statement he

14   made . . . and attempting to retract it."  Reply 12-13.

15         None of these inconsistencies are sufficiently "clear and unambiguous" to justify striking

16   Kyles's declaration or any portion of it.  The additional information contained in the declaration is

17   minor, Kyles's statement that he "really can't remember" everything about what happened when

18   he was being tased is not inconsistent with his subsequent revelation of additional minor details,

19   and it is not clear from the deposition transcript what Kyles was attempting to convey when he

20   stated that the incident was about the officers "trying to get me into a position where I was

21   submissive."  As to the inconsistency between Saechao's and Kyles's testimony regarding what

22   was said at the hospital, defendants have not presented any authority for applying the sham

23   affidavit rule to an inconsistency between deposition testimony and an alleged unsworn statement.

24   *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) ("This is different, however, from

25   our sham affidavit cases, because plaintiff's] deposition testimony and sworn declaration in this

26   case are consistent and are contradicted only by [his] unsworn letters.").  Kyles's credibility is a

27   question for the jury, not me.  Defendants' sham affidavit objections to Kyles's declaration are

28   OVERRULED.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    On the other hand, defendants' objection to paragraph 14 of Kyles's declaration, in which

2    Kyles states that he was induced to plead no contest to violating section 148(a)(1) by

3    misrepresentations from the district attorney and public defender's offices, is GRANTED.  This

4    information is not relevant to the validity of Kyles's claims against defendants.  *See, e.g., Wetter v.*

5    *City of Napa*, No. 07-cv-04583-WHA, 2008 WL 62274, at *4 (N.D. Cal. Jan. 4, 2008)

6    (disregarding plaintiff's argument that *Heck* should not bar his unlawful arrest claim because of

7    the circumstances of his no contest plea under section 148(a)(1); stating that "whether the plea was

8    coerced or breached is not before this Court").

9    **B.  Declarations of Barry Brodd and Richard Polsky**

10    In support of his opposition brief, Kyles submitted declarations by expert witnesses Barry

11    Brodd and Richard Poslky.  Brodd is a former police officer and current expert and consultant in

12    the fields of law enforcement, police officer defensive tactics, police officer safety, and police

13    officer use of force.  Brodd Decl. ¶¶ 2-3.  Polsky is an expert in animal behavior.  Polsky Decl. ¶ B

14    (Dkt. No. 35).  Because I do not rely on either the Brodd or the Polsky declaration to resolve this

15    motion, I decline to rule on defendants' objections at this time.

16    **C.  Documents Regarding Kyles's Administrative Claim**

17    Defendants submitted two exhibits regarding the administrative claim filed by Kyles with

18    the City of Pittsburg in connection with the November 30, 2011 incident.  The first exhibit is the

19    claim itself, the attached proof of service, and the envelope in which the documents were delivered

20    to the City.  Allen Decl., Ex. F (Dkt. No. 25).  The second exhibit is the "Notice of Untimely

21    Claim" sent by the City to Kyles informing him that his claim was not timely presented.  *Id.* at

22    Ex. G.  Defendants offer the exhibits to show that Kyles failed to comply with the claim

23    presentment requirements of the California Tort Claims Act, and that his state law tort claims are

24    barred as a result.  *See* Mot. 24-25.  Kyles objects that the exhibits are hearsay, that Kevin Allen,

25    the author of the declaration to which the exhibits are attached, lacks personal knowledge, and that

26    Allen's description of the exhibits lacks foundation.  Opp. 15 n.3.

27    Based on my conclusion, discussed in detail below, that the City's "Notice of Untimely

28    Claim" failed to comply with the California Tort Claims Act and that defendants therefore waived

11

any timeliness defense to Kyles's administrative claim, these objections are OVERRULED AS

MOOT.[3]

## II. UNLAWFUL ARREST

Defendants contend that Kyles's unlawful arrest claim is barred under *Heck*, according to

which a plaintiff may not prevail on a section 1983 claim if doing so "would necessarily imply the

invalidity" of an extant conviction arising out of the same underlying facts as the civil action.  512

at 487.  "*Heck*, in other words, says that if a criminal conviction stands and is fundamentally

_____

[3] On October 22, 2014, the same day as the hearing on this motion, Kyles filed an additional brief
asserting several evidentiary objections which were not raised in Kyles's opposition.  Dkt. No. 52.
These objections are OVERRULED.  First, they are in plain violation of Civil Local Rule 7-3(a),
which requires that any evidentiary or procedural objections to a motion be contained within the
opposition brief.  Civ. L. R. 7-3(a).  Second, they are meritless.  Kyles objects to Saechao's
declaration testimony that while at the hospital following the November 30, 2011 incident, Kyles
said he became "enraged" after he was tased and could not specifically remember what he did,
although he did remember fighting with the police and not being able to control himself.  *See*
Saechao Decl. ¶¶ 3-4.  Kyles argues this testimony is inadmissible under the hearsay rule and
under *Miranda v. Arizona*, 384 U.S. 436 (1966).  The hearsay objection fails because of the
opposing party statement exception to the hearsay rule.  *See* FRE 801(d)(2) (a statement is not
hearsay where it "is offered against an opposing party and . . . was made by the party in an
individual or representative capacity").  The *Miranda* objection fails for any number of reasons,
including that this is a civil case, not a criminal prosecution.  *See Hanson v. Dane Cnty., Wis.*, 608
F.3d 335, 339 (7th Cir. 2010) (noting that "the results of interrogation without *Miranda* warnings
are admissible in civil cases.").

Kyles also argues that evidence of his no contest plea and conviction should be excluded as
irrelevant because, in light of the fact that he has filed a habeas petition in state court, the
conviction "is not final" and therefore does not act as a bar under *Heck*.  Kyles does not cite any
authority in support of this proposition, and it is wrong.  A conviction may act as a bar under *Heck*
so long as it has not been "reversed on direct appeal, expunged by executive order, declared
invalid by a state tribunal authorized to make such determination, or called into question by a
federal court's issuance of a writ of habeas corpus."  *Heck*, 512 U.S. at 487.  In other words, the
conviction must have "already been invalidated."  *Id.*; *see also, Rodriguez v. Kwok*, No. 13-cv-
04695-SI, 2014 WL 2110256, at *2 n.1 (N.D. Cal. May 20, 2014) ("[T]he mere filing of a habeas
petition is insufficient to overcome the *Heck* bar, as *Heck* requires that the conviction or sentence
already be invalidated.").  At most, the fact of Kyles's pending state habeas petition is grounds for
abstention until the petition is resolved.  *See Heck*, 512 U.S. at 487 n.8 (noting in dicta that "if a
state criminal defendant brings a federal civil-rights lawsuit during the pendency of his criminal
trial, appeal, or state habeas action, abstention may be an appropriate response to the parallel state-
court proceedings.").  Because neither party has requested abstention, I do not consider whether it
would be appropriate here.  I conclude only that evidence of Kyle's no contest plea and conviction
remains relevant to this case, and that his conviction may operate to bar certain of his claims under
*Heck*.

1   inconsistent with the unlawful behavior for which section 1983 damages are sought, the 1983

2   action must be dismissed." *Smithart v. Towery*, 79 F.3d 951, 952 (9th Cir. 1996).  Defendants are

3   correct.

4         Kyles's plea of no contest to California Penal Code section 148(a)(1) qualifies as a

5   conviction under *Heck*.  Although the Ninth Circuit has not squarely addressed this issue in a

6   published opinion, the court has repeatedly treated no contest pleas in California state court as

7   convictions when applying the *Heck* doctrine.  *See Szajer v. City of Los Angeles*, 632 F.3d 607,

8   609-12 (9th Cir. 2011); *Ove v. Gwinn*, 264 F.3d 817, 823 n.4 (9th Cir. 2001); *see also, Radwan v.*

9   *Cnty. of Orange*, 519 F. App'x 490, 490-91 (9th Cir. 2013) ("We have repeatedly found *Heck* to

10   bar section 1983 claims, even where the . . . prior convictions were the result of guilty or no

11   contest pleas.").  Courts in this district have likewise concluded that no contest pleas are

12   convictions for *Heck* purposes.  In *Wetter v. City of Napa*, the court examined the exact same

13   question raised by this case – i.e., whether a plea of no contest to California Penal Code section

14   148(a)(1) acts as a bar to a subsequent section 1983 claim.  2008 WL 62274,*2-3.  The court

15   concluded that it does.  *Id.*  The court reasoned:  "The purpose of the *Heck* doctrine is to ensure

16   that valid state criminal convictions and sentences are not, in effect, retroactively contradicted by

17   subsequent federal civil actions.  That purpose applies to any conviction whether by guilty plea or

18   nolo contendre plea." *Id.* at *3.  Likewise, in *Webb v. City & Cnty. of San Francisco*, No. 11-cv-

19   00476-CRB, 2011 WL 6151605 (N.D. Cal. Dec. 12, 2011), the court held that a no contest plea in

20   California state court "has the same effect as a guilty plea or other conviction for the purposes of

21   applying the *Heck* doctrine." *Id.* at *6.  Kyles's argument that his no contest plea is not cognizable

22   as a conviction under *Heck* is not supported by case law or other authority, and it fails.

23         The next step in the *Heck* analysis is whether a favorable ruling on Kyles's unlawful arrest

24   claim would necessarily imply the invalidity of his conviction under section 148(a)(1).  *See Heck*,

25   512 U.S. at 487.  This issue has also been repeatedly and consistently addressed by courts in this

26   circuit.  The court in *Wetter* held that the plaintiff's unlawful arrest claim was barred by his section

27   148(a)(1) conviction because under California law, a section 148(a)(1) conviction requires that the

28   arresting officer was acting lawfully at the time of the arrest.  2008 WL 62274, at *3; *see also*

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1  *Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401, 1409 (2002) ("In California, the lawfulness

2  of an arrest is an essential element of the offense of resisting or obstructing a peace officer.  If the

3  officer was not performing his or her duties at the time of the arrest, the arrest is unlawful and the

4  arrestee cannot be convicted under [section 148(a)].") (internal citations omitted).  An officer only

5  acts lawfully at the time of arrest where the arrest is supported by probable cause.  *Wetter*, 2008

6  WL 62274, at *4; *see also, Mong Kim Tran v. City of Garden Grove*, No. 11-cv-01236, 2011 WL

7  5554370, at *3 (C.D. Cal. Nov. 14, 2011) ("Probable cause is a necessary element [under] section

8  148(a)(1).").  Thus, a finding that the plaintiff's arrest was unsupported by probable cause, as

9  would be required for the plaintiff to prevail on his unlawful arrest claim, would necessarily imply

10  the invalidity of the plaintiff's section 148(a)(1) conviction in direct contravention of *Heck*.

11  *Wetter*, 2008 WL 62274, at *4.

12       Likewise, in *Mong Tim Kran v. City of Garden Grove,* the court concluded that *Heck*

13  barred the plaintiff's false arrest claim following his section 148(a)(1) conviction because "in

14  order to prevail on a section 1983 claim for false arrest . . . [plaintiff] would have to demonstrate

15  that there was no probable cause to arrest him.  Such a result would invalidate the conviction,

16  which *Heck* clearly prohibits."  2011 WL 5554370, at *3; *see also, Smithart*, 79 F.3d at 952

17  ("There is no question that *Heck* bars [plaintiff's claims] that defendants lacked probable cause to

18  arrest him . . . [Plaintiff] may challenge the validity of his arrest . . . only by writ of habeas

19  corpus.").

20       Kyles has not presented any contrary authority, and, indeed, presents virtually no argument

21  in his opposition brief in support of his unlawful arrest claim.  *See* Opp. at 11-12, 14.  Because it is

22  barred by *Heck*, defendants are entitled to summary judgment on this cause of action.

23  **III.  EXCESSIVE FORCE**

24       **A.  Kyles's excessive force claims are not barred under *Heck*.**

25       Defendants argue that *Heck* also bars Kyles's excessive force claims.  The argument is

26  based on the law that an officer only acts lawfully at the time of arrest, as required for a conviction

27  under section 148(a)(1), where the officer uses no more than reasonable force to overcome any

28  resistance and complete the arrest.  *See Hooper v. Cnty. of San Diego*, 629 F.3d 1127, 1130 (9th

14

1   Cir. 2011); *see also, Rodriguez v. City of Modesto*, 535 F. App'x 643, 644 (9th Cir. 2013) (noting

2   that, for the purposes of section 148(a)(1), "a police officer is not lawfully performing her duties if

3   she arrests an individual without probable cause, or uses unreasonable or excessive force on the

4   individual at the time the [individual's] unlawful resistance, delay or obstruction is occurring")

5   (internal citations omitted).  In certain circumstances, an excessive force claim brought under

6   section 1983 may threaten the validity of a section 148(a)(1) conviction and be prohibited under

7   *Heck*.  "The relevant question is whether success in [the] section 1983 suit would 'necessarily

8   imply' or 'demonstrate' the invalidity of the earlier conviction."  *Beets v. Cnty. of Los Angeles*,

9   669 F.3d 1038, 1046 (9th Cir. 2012) (quoting *Heck*, 512 U.S. at 487).

10      Two recent Ninth Circuit cases, *Hooper v. Cnty. of San Diego* and *Beets v. Cnty. of Los*

11   *Angele*s, help define the boundary between an excessive force claim arising from the same factual

12   circumstances as a section 148(a)(1) conviction that is barred by *Heck*, and one that is not.

13      In *Hooper*, the Ninth Circuit held that *Heck* does not bar recovery where the section

14   148(a)(1) conviction and the section 1983 excessive force claim "are based on different actions

15   during one continuous transaction."  629 F.3d at 1134 (internal quotation marks omitted).  Hooper

16   was detained by a private security officer on suspicion of shoplifting from a Long's Drugs.  *Id.* at

17   1129.  She was calm and compliant when the arresting officer arrived, and she gave the officer her

18   car keys so that he could search her car.  *Id.*  When the officer discovered a crystalline substance

19   he believed to be methamphetamine in the car, he grabbed Hooper by the wrist and told her she

20   was under arrest for possession.  *Id.*  Hooper jerked her hand away from the officer, and in the

21   ensuing struggle, Hooper ended up on the ground, lying on her stomach, with the officer on top of

22   her.  *Id.*  The officer then called for his police dog, which bit Hooper's head once, lost its hold,

23   then bit her head again and held it until the officer's backup arrived.  *Id.*  Hooper pled guilty to

24   violating section 148(a)(1).  *Id.*  In the section 1983 action for excessive force that followed, the

25   district court granted summary judgment for defendants on the ground that *Heck* barred Hooper's

26   excessive force claims.  *Id.*

27      The Ninth Circuit reversed.  The court reasoned that a section 148(a)(1) conviction does

28   not necessarily bar all excessive force claims arising from the same underlying incident because

United States District Court
Northern District of California

"[i]t is sufficient for a valid conviction under section 148(a)(1) that at some time during a continuous transaction an individual resisted, delayed, or obstructed an officer when the officer was acting lawfully.  It does not matter that the officer might also, at some other time during that same continuous transaction, have acted lawfully."  *Id.* at 1132.  Accordingly, so long as the excessive force claim is "based on different actions" than the section 148(a)(1) conviction, the claim is not barred by *Heck*, even where the claim and the conviction arise from the same "continuous transaction."  *Id.* at 1134.  In such situations, "two isolated factual contexts [ ] exist, the first giving rise to criminal liability on the part of the criminal defendant, and the second giving rise to civil liability on the part of the arresting officer."  *Id.* at 1132 (internal quotation marks and emphasis omitted).  Applying this rule to the facts of Hooper's case, the court concluded that the district court erred in granting summary judgment for the defendants because "[a] holding in Hooper's section 1983 case that the use of the dog was excessive force would not negate the lawfulness of the initial arrest attempt, or negate the unlawfulness of Hooper's attempt to resist it when she jerked her hand away from [the officer]."  *Id.* at 1133.

In *Beets*, decided just one year after *Hooper*, the Ninth Circuit affirmed the district court's dismissal under *Heck* of a section 1983 excessive force suit.  669 F.3d at 1042-48.  The action was brought by the parents of a man who was shot and killed by a sheriff's deputy.  *Id.* at 1040.  The man's accomplice had been tried and convicted of aiding and abetting in the assault of a peace officer with a deadly weapon, an offense which, like section 148(a)(1), requires a finding that the officer was "lawfully performing his duties" and not "using unreasonable or excessive force."  *Id.* at 1045.  The deputy shot the man as he and his accomplice, in their attempt to flee from the authorities, rapidly backed a pickup truck in the deputy's direction, causing him to fear for his life.  *Id.* at 1040.  The accomplice's conviction for aiding and abetting in the assault of a peace officer with a deadly weapon was based on this use of the pickup truck.  *Id.* at 1043.

The parents argued that there were "several possible factual bases for [the accomplice's] conviction and that therefore [her] conviction [was] not necessarily based on the same factual basis as the alleged civil rights violations."  *Id.* at 1045.  The Ninth Circuit disagreed, reasoning that "there was no separation" between the conduct that gave rise to the accomplice's conviction

16

1    and "the alleged use of excessive force." *Id.* at 1045-46.  The court also emphasized that a jury

2    verdict, unlike a plea, "necessarily determines the lawfulness of the officers' actions throughout

3    the whole course of the defendant's conduct," so that a subsequent section 1983 excessive force

4    action brought by the defendant "would necessarily imply the invalidity of his conviction." *Id.* at

5    1045 (internal quotation marks omitted).  Since *Beets*, at least two judges in this district have held

6    that a section 148(a)(1) conviction obtained by jury verdict barred a subsequent section 1983

7    action for excessive force.  *See Lozano v. City of San Pablo*, No. 14-cv-00898-KAW, 2014 WL

8    4386151, at *6 (N.D. Cal. Sept. 4, 2014) ("The jury verdict in the state court proceedings brings

9    this case squarely in line with *Beets*."); *Tarantino v. City of Concord*, No. 12-cv-00579-JCS, 2013

10   WL 3722476, at *3 (N.D. Cal. July 12, 2013) (holding that plaintiff's convictions at trial for

11   assault on a peace officer and violation of section 148(a)(1) barred plaintiff's excessive force

12   claims where the jury made special findings that plaintiff "initiated a physical altercation" with the

13   officers and "did not act in self-defense").

14          Defendants are wrong that the instant case is analogous to *Beets*.  Kyles was convicted by a

15   plea of no contest, not by a jury trial.  His conviction thus did not "necessarily determin[e] the

16   lawfulness of the officers' actions throughout the whole course of [his] conduct." *Beets*, 669 F.3d

17   at 1045.[4]  Rather, this is a case, like *Hooper*, where different actions occurred during the course of

18   one continuous transaction.  It is not clear from the record which of those actions provided the

19   factual basis for Kyles's conviction under section 148(a)(1).  Although defendants submitted

20   several documents concerning Kyles's criminal charges and plea, none of the documents reveal

21   the factual basis for his conviction.  *See* RJN, Exs. A-C.  The mere fact that Kyles pled no contest

22   _____

23   [4] At least one Ninth Circuit judge has criticized the distinction drawn in *Beets* between convictions
     by plea and convictions by jury verdict, observing that it does not make sense to assume that
24   a guilty jury verdict "necessarily determines the lawfulness" of an officer's actions throughout the
     course of his encounter with a section 1983 plaintiff unless the jury was "actually . . . instructed
25   that, to convict, it had to find that the office[r] acted lawfully throughout the whole course of [the]
     encounter." *Wilson v. City of Long Beach*, 567 F. Appx. 485, 486-88 (9th Cir. 2014) (Watford, J.,
26   dissenting).  Even apart from the fact that the underlying conviction in this case was by plea
     instead of jury verdict, this case is also distinguishable from *Beets* because, in that case, "there was
27   no separation" between the conduct that gave rise to the conviction – i.e., the rapid backing up of
     the pickup truck – and the alleged use of excessive force.  669 F.3d at 1045-46.  Here, in contrast,
28   it is reasonable to infer that Kyles's initial combative demeanor gave rise to his section 148(a)(1)
     conviction, while the officers' alleged use of excessive force occurred thereafter.

United States District Court
Northern District of California

1    to a section 148(a)(1) charge does not automatically imbue every aspect of the officers' conduct

2    during the November 30, 2011 encounter with an irrebuttable presumption of lawfulness.  The

3    question remains whether it is reasonable to infer that Kyles's section 148(a)(1) conviction and his

4    excessive force claims are "based on different actions."  *Hooper*, 629 F.3d at 1134.

5          That inference is reasonable.  Viewing the evidence in the light most favorable to the

6    nonmoving party, the encounter between Kyles and the officers appears to involve "two isolated

7    factual contexts . . . , the first giving rise to criminal liability on the part of [Kyles], and the second

8    giving rise to civil liability on the part of the arresting officer[s]."  *Id.* at 1132 (internal quotation

9    marks omitted).  According to Simental's deposition testimony, Simental's determination that

10   Kyles had violated section 148(a)(1) was based exclusively on Kyles's combative demeanor upon

11   exiting the sedan, not on any aspect of the subsequent physical altercation.  Simental Depo. at 15-

12   16.  Indeed, Simental testified that he decided to arrest Kyles for violating section 148(a)(1) before

13   any physical contact had occurred – it was only because of Simental's attempt to arrest Kyles that

14   the physical altercation between Kyles and the officers began in the first place.  *Id.*  It is thus

15   reasonable to infer that Kyles's section 148(a)(1) conviction was based wholly on his initial

16   obstruction of Simental's lawful investigation of the 1906 Seward Drive residence, and that a

17   finding that the officers subsequently used excessive force against Kyles would in no way imply

18   the invalidity of the conviction.  In these circumstances, *Heck* is no bar to an excessive force

19   claim.

20         **B.  Whether the officers' use of force was reasonable is a question for the jury.**

21         "Determining whether the force used to effect a particular seizure is reasonable under the

22   Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the

23   individual's Fourth Amendment interests against the countervailing government interests at

24   stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The gravity of a particular intrusion on an

25   individual's Fourth Amendment interests depends on "the type and amount of force inflicted."

26   *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994).  Factors relevant to the governmental interests

27   at stake include: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate

28   threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or

United States District Court
Northern District of California

United States District Court
Northern District of California

1   attempting to evade arrest by flight." *Id.* This list is not exhaustive; for example, in certain cases,

2   "the availability of alternative methods of capturing or subduing a suspect may be a factor to

3   consider." *Id.* at 1440 n.5.

4        The inquiry is an objective one, meaning that "the reasonableness of a particular use of

5   force must be judged from the perspective of a reasonable officer on the scene rather than with the

6   20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *see also, Chew*, 27 F.3d at 1440 ("[T]he

7   reasonableness of a seizure must . . . be assessed by carefully considering the objective facts and

8   circumstances that confronted the arresting officer or officers."). Because application of this

9   reasonableness test "nearly always requires a jury to sift through disputed factual contentions, and

10  to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary

11  judgment . . . in excessive force cases should be granted sparingly." *Drummond ex rel.*

12  *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (internal quotation marks

13  omitted); *see also, Chew*, 27 F.3d at 1440 ("[T]he propriety of a particular use of force is generally

14  an issue for the jury."). That said, a defendant police officer "can still win on summary judgment

15  if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the

16  officer's use of force was objectively reasonable under the circumstances." *Liston v. Cnty. of*

17  *Riverside*, 120 F.3d 965, 981 n.10 (9th Cir. 1997).

18       I cannot say at this juncture that the officers' use of force against Kyles was objectively

19  reasonable as a matter of law. According to Kyles's version of events, when Kyles, unarmed,

20  exited the sedan, Simental had already drawn his firearm and was pointing it at him. Kyles Decl. ¶

21  4. Simental told Kyles to "turn the fuck around" and to place his hands on his head. *Id.* Kyles

22  offered brief, verbal resistance and then agreed to walk with Simental to the police vehicle. *Id.*

23  As Kyles did so, Simental "attacked" Kyles, forced him to the ground, and, without warning,

24  began tasing him. *Id.* Kyles begged Simental to stop, but Simental continued tasing him, causing

25  Kyles to jerk uncontrollably. *Id.* ¶ 6-8. Palma deployed Xena, who began "ripping" at Kyles's

26  leg, tearing a large hole in his left calf. *Id.* ¶ 9. One of the officers repeatedly said, "Good girl,"

27  while Kyles shouted, "Get it off!" *Id.* ¶ 11. Although Kyles's only physical movements during

28  this time were involuntary responses either to the tasings or to the extreme pain caused by Xena's

1    biting, Simental struck Kyles twice with a flashlight, an officer pressed a knee or foot against the

2    back of Kyles's head, and an officer struck Kyles's head with an unidentified heavy object.  *Id.* ¶

3    10.

4              Based on these facts, a reasonable juror could find that the officers' use of force was

5    excessive.  Kyles identifies five instances of allegedly excessive force used against him:  (i)

6    Simental's "initial attack from behind;" (ii) the approximately five tasings deployed by Simental

7    against his back; (iii) Xena's biting of his left leg; (iv) the flashlight strikes against his arm; and

8    (v) the blow to his head with an unidentified heavy object.  Opp. 12.  Although not all of these

9    intrusions are particularly severe, the governmental interests at stake were minimal.  Viewed in the

10   light most favorable to Kyles, the evidence indicates that the officers were faced with an unarmed

11   individual whose only suspected crime was obstructing Simental's investigation of the 1906

12   Seward Drive residence and who was not resisting, either verbally or physically, at the time the

13   force was used against him.  Accordingly, a reasonable juror could conclude that the intrusion on

14   Kyles's Fourth Amendment interests caused by each of the five uses of force, gauged by the type

15   and amount of force inflicted, far outweighed the governmental interests at stake.  *See*

16   *Blankenhorn v. City of Orange*, 485 F.3d 463, 478-480 (9th Cir. 2007) (reasonable juror could

17   find that officers used excessive force by "gang tackling" plaintiff and then punching him, where

18   plaintiff was suspected only of misdemeanor trespass and was not actively resisting at time of

19   gang tackle)*; Sayavanh v. City of Tukwila*, No. 11-cv-00038, 2012 WL 1022912, at *6-8 (W.D.

20   Wash. Mar. 23, 2012) (reasonable juror could determine that officer's "unprovoked" shoving of

21   plaintiff to the ground constituted excessive force); *Josfan v. Indochine*, No. 09-cv-07904, 2012

22   WL 113371, at *9-10 (C.D. Cal. Jan. 13, 2012) (plaintiff raised triable issue on whether officers

23   used excessive force, where undisputed facts showed that officers "physically grabbed plaintiff,

24   forced him to the ground, and handcuffed him," and plaintiff testified that he was not resisting);

25   *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, No. 09-cv-0344, 2010 WL 2179964, at *4 (E.D.

26   Cal. May 27, 2010) ("Taking [the] allegations as true, [the officer] used unreasonable force against

27   [plaintiff] by dragging him to the ground and pinning him there because [plaintiffs] posed no

28   danger to the officers, did nothing to provoke them, and there was no severe crime at issue.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    This is especially so with regard to the tasings and the dog bite.  *See Brooks v. City of Seattle*, 661

2    F.3d 433, 446 (9th Cir. 2011) (reasonable juror could find excessive force where officer contact-

3    tased plaintiff three times over the course of one minute after plaintiff, who had been pulled over

4    and issued a speeding citation, "actively resisted arrest [by] refus[ing] to get out of her car when

5    instructed to do so and stiffen[ing] her body and clutch[ing] her steering wheel to frustrate the

6    officers' efforts to remove her from her car"); *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087,

7    1093 (9th Cir. 1998) (holding, in case where police dog bit plaintiff for approximately fifteen

8    seconds in officer's presence, that "excessive duration of the bite and improper encouragement of

9    a continuation of the attack by officers could constitute excessive force").  Kyles has raised

10   genuine issues of fact regarding the reasonableness of the force used against him, and the officers

11   are not entitled to summary judgment on this ground.

12        **C.  Saechao may be held liable for Simental and Palma's use of excessive force.**

13        "[P]olice officers have a duty to intercede when their fellow officers violate the

14   constitutional rights of a suspect or other citizen."  *Cunningham v. Gates*, 229 F.3d 1271, 1289

15   (9th Cir. 2000).  "[T]he constitutional right violated by the passive defendant is analytically the

16   same as the right violated by the person who strikes the blows."  *United States v. Koon*, 34 F.3d

17   1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996).  Thus, "an officer

18   who is present at the scene and who fails to take reasonable steps to protect the victim of another

19   officer's use of excessive force can be held liable under section 1983 for his nonfeasance."

20   *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 207 n.3 (1st Cir. 1990).  "Importantly,

21   however, officers can be held liable for failing to intercede only if they had an opportunity to

22   intercede."  *Cunningham*, 229 F.3d at 1289.  "A police officer cannot be held liable for failing to

23   intercede if he has no realistic opportunity to prevent an attack."  *Gaudreault*, 923 F.2d at 207.

24        Kyles has not presented evidence that Saecho inflicted any of the five instances of

25   excessive force that Kyles alleges were used against him.  The record indicates that Simental

26   forced Kyles to the ground, tased him, and struck him with the flashlight, and that Palma made the

27   decision to deploy Xena.  *See, e.g.,* Simental Depo. at 57, 63-64, 71-72; Palma Depo. at 27-28.

28   The one alleged use of force that is unaccounted for in the record is the blow to Kyles's head with

1    the unidentified heavy object.  While neither Simental nor Palma testified to doing this, there is no

2    indication either that Saecho did it.

3        On the other hand, Saecho testified that he was the second officer to arrive on the scene.

4    Saecho Depo. at 16.  His testimony indicates that for most of the incident, including during most if

5    not all of the tasings and throughout the dog bite, he was kneeling over Kyles, in close proximity

6    both to Simental and to where Xena was biting Kyles's leg.  The video submitted by defendants

7    shows that the physical altercation between Kyles and the officers lasted for at least ninety

8    seconds.  Allen Decl., Ex. D.  Viewing these facts in the light most favorable to Kyles, it is

9    reasonable to infer that this amount of time, combined with Saechao's proximity to the alleged

10   misconduct, provided Saecho with a realistic opportunity to intercede.  *Contrast with, Gaudreault*,

11   923 F.2d at 207 n.3 (no realistic opportunity to intercede where "the attack came quickly and was

12   over in a matter of seconds"); *Mendez v. Montour*, No. 12-cv-04170-WHO, 2014 WL 1218665, at

13   *1-4 (N.D. Cal. Mar. 21, 2014) (no realistic opportunity to intercede where excessive force claim

14   was based on other officer's act of suddenly and unexpectedly knocking plaintiff to ground and

15   then slamming plaintiff's head against the police vehicle).  Kyles may maintain his excessive force

16   claims against Saechao.

17       **D.  The officers are not entitled to summary judgment based on qualified immunity.**

18       "The doctrine of qualified immunity protects government officials from liability for civil

19   damages insofar as their conduct does not violate clearly established statutory or constitutional

20   rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231,

21   (2009) (internal quotation marks omitted).  Whether a right was clearly established must be

22   determined "in light of the specific context of the case, not as a broad general proposition."

23   *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "The contours of the right must be sufficiently clear

24   that a reasonable official would understand that what he is doing violates that right."  *Anderson v.

25   Creighton*, 483 U.S. 635, 640 (1987).  This "requirement . . . does not mean that the very action at

26   issue must have been held unlawful before qualified immunity is shed."  *Blankenhorn*, 485 F.3d at

27   481.  On the contrary, "officials can still be on notice that their conduct violates established law

28   even in novel factual circumstances."  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir.

United States District Court
Northern District of California

22

1   2013) (internal quotation marks omitted).  "But while there need not be a case directly on point,

2   existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*

3   (internal quotation marks omitted).  Where, as here, there exist genuine issues of material fact

4   regarding the constitutional violation in question, "summary judgment is appropriate only if

5   defendants are entitled to qualified immunity on the facts as alleged by the nonmoving party."

6   *Blankenhorn*, 485 F.3d at 477.

7       Summary judgment is not appropriate here.  In *Blankenhorn v. City of Orange*, after

8   holding that there was a triable issue as to whether the defendant officers used excessive force by

9   "gang tackling" and punching the plaintiff, the Ninth Circuit concluded that the officers were not

10  entitled to qualified immunity.  485 F.3d at 480-81.  The court reasoned that in determining

11  whether the rights at issue were clearly established at the time of the underlying incident,

> we need look no further than *Graham*'s holding that force is only justified when
> there is a need for force. We conclude that this clear principle would have put a
> prudent officer on notice that gang-tackling without first attempting a less violent
> means of arresting a relatively calm trespass suspect – especially one who had
> been cooperative in the past and was at the moment not actively resisting arrest –
> was a violation of that person's Fourth Amendment rights. This same principle
> would also adequately put a reasonable officer on notice that punching [plaintiff]
> to free his arms when, in fact, he was not manipulating his arms in an attempt to
> avoid being handcuffed, was also a Fourth Amendment violation.

18  *Id.* at 481.

19      Under *Blankenhorn*, the acts of forcing Kyles to the ground, striking him with a flashlight,

20  and hitting him with another heavy object, if proven at trial, constituted violations of Kyles's

21  clearly established Fourth Amendment rights.  It is true that Kyles has not presented evidence that

22  he had been cooperative with the officers in the past – indeed, the only relevant evidence in the

23  record indicates just the opposite.  *See* Simental Depo. at 11 ("I knew [Kyles] was violent towards

24  police . . . [Kyles] is a fighter.  He likes to fight the police.").  But the facts of this case are

25  otherwise analogous.  According to Kyles's version of events, which must be credited as true for

26  the purposes of this analysis, he was, like the plaintiff in *Blankenhorn*, "relatively calm" and "not

27  actively resisting" when Simental forced him to the ground.  Kyles was then struck several times

28  despite his only movements being not attempts to resist, but involuntary reactions triggered by the

United States District Court
Northern District of California

23

tasings and the pain of Xena's biting. *Blankenhorn*, and the Fourth Amendment principles described therein, put the officers on notice that a calm and nonresisting suspect such as Kyles could not constitutionally be forced to the ground and repeatedly struck. *See also, Sayavanh*, 2012 WL 1022912, at *8 ("[Plaintiff] had a clearly established right to be free from allegedly unprovoked force by being shoved to the ground."); *Newman*, 2010 WL 2179964, at *5 (E.D. Cal. May 27, 2010) ("[A]ny reasonable officer would know that he or she does not have the right to drag a person to the ground and pin that person there in the absence of flight, provocation, or other exigent circumstances.").

By the date of the incident, November 30, 2011, it was also clearly established law that a taser, even in "contact tase" mode, could not be lawfully deployed against an individual acting as Kyles contends he was.  In *Brooks v. City of Seattle*, issued on October 17, 2011, the Ninth Circuit held that a juror could reasonably find excessive force where an officer contact-tased the plaintiff three times over the course of one minute after she "actively resisted arrest [by] refus[ing] to get out of her car when instructed to do so and stiffen[ing] her body and clutch[ing] her steering wheel to frustrate the officers' efforts to remove her from her car."  661 F.3d at 446.  The plaintiff, who was pregnant at the time, was pulled over and issued a citation for speeding but refused to sign the citation or exit her vehicle. *Id.* at 436-37.  After learning that the plaintiff was pregnant and attempting but failing to forcibly remove her from her vehicle, the officer tased her once on her left thigh, once her on left arm, and once on her neck, at which point she collapsed and was dragged out of the vehicle. *Id.* at 437.  The court applied the *Graham* factors and concluded that a reasonable fact-finder could find excessive force because:

> [Plaintiff's] alleged offenses were minor. She did not pose an immediate threat to the safety of the officers or others. She actively resisted arrest insofar as she refused to get out of her car when instructed to do so and stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car. [Plaintiff] did not evade arrest by flight, and no other exigent circumstances existed at the time. She was seven months pregnant, which the officers knew, and they tased her three times within less than one minute, inflicting extreme pain.

*Id.* at 445-46.

*Brooks* put the officers on notice that the use of a taser against Kyles was unconstitutional

in the circumstances as Kyles recounts them.  As in *Brooks*, Kyles's alleged offense – i.e.,
obstructing Simental's investigation of the 1906 Seward Drive residence – was minor.  Kyles was
initially verbally combative, but he was unarmed and by the time any force was applied against
him, he was calm and compliant.  Kyles Depo. ¶ 4.  Kyles did not attempt to evade arrest by flight,
and the record does not contain evidence of other exigent circumstances compelling the officers to
use a greater than usual amount of force against him.  Kyles was tased five times in a short time
span, causing him to lose control of his muscles, spasm involuntarily, and beg for the tasing to
stop.  *Id.* ¶ 6-8.  While Kyles was not pregnant, the plaintiff's pregnancy in *Brooks* does not
appear to be a dispositive factor in the court's analysis.  Moreover, according to Kyles's
testimony, unlike the plaintiff in *Brooks*, he was not in any way resisting when the allegedly
excessive force was used against him.  Kyles Depo. ¶ 4.

   Finally, if Kyles's version of events is proven at trial, a juror could reasonably conclude
that the deployment of Xena violated clearly established law.  *See Watkins,* 145 F.3d at 1093
(holding that in 1998 the law was "clearly established that excessive duration of [a police dog] bite
and improper encouragement of a continuation of the attack by officers could constitute excessive
force"); *Mendoza v. Block,* 27 F.3d 1357, 1362 (9th Cir. 1994) ("We do not believe that a more
particularized expression of the law is necessary for law enforcement officials using police dogs to
understand [than] that under some circumstances the use of such a 'weapon' might become
unlawful.  For example, no particularized case law is necessary for a deputy to know that
excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully
surrendered and is completely under control.").

   Defendants  rely on *Miller v. Clark Cnty.,* 340 F.3d 959 (9th Cir. 2003), for the proposition
that the law regarding the deployment of Xena against Kyles was not clearly established on
November 30, 2011, but that reliance is misplaced.  In *Miller*, the police dog was only deployed
after the officers "had attempted several less forceful means" to arrest Miller, including signaling
with emergency lights and sirens for him to stop his car, pursuing his car in a police vehicle,
pursuing him on foot, and warning him that if he did not surrender a police dog would be sent to
capture him.  *Id.* at 966.  By the time the dog was released, Miller was "crouching in the darkness

United States District Court
Northern District of California

1    in [an] unbounded landscape familiar only to Miller and treacherous to others who might enter."

2    *Id.* at 967.  The court also found it "important that [the officer] arrived on the scene soon after he

3    heard Miller scream and that [the officer] commanded [the dog] to release Miller as soon as [the

4    officer] determined that Miller was unarmed."  *Id.* at 968.  Here, in contrast, a juror could

5    reasonably conclude that Kyles neither resisted nor attempted to evade arrest, that he was not

6    positioned in a "treacherous landscape" when Xena was deployed against him, and that the

7    officers allowed Xena to continue biting for longer than necessary.  Given these factual

8    differences, *Miller* does not support the officers' assertion that qualified immunity applies here.

9        Kyles has presented sufficient evidence to raise triable issues as to whether the officers are

10   entitled to qualified immunity.  Accordingly, the officers' request for summary judgment on this

11   ground is denied.

12   **IV.  MONELL LIABILITY**

13       Because Kyles has not presented sufficient evidence to create a triable issue as to whether

14   the City of Pittsburg may be held liable for Kyles's alleged constitutional injuries, the City is

15   entitled to summary judgment on the section 1983 cause of action.

16       A municipal entity may not held liable under section 1983 for the unconstitutional acts of

17   its employees on a theory of respondeat superior.  *Connick v. Thompson*, 131 S. Ct. 1350, 1359

18   (2011).  Under *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978), a

19   municipality may only be held liable under section 1983 where the constitutional violation was

20   caused by the municipality's policy, custom, or practice.  *Id.* at 690–91.  "[I]t is not enough for a

21   section 1983 plaintiff merely to identify conduct properly attributable to the municipality. The

22   plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the

23   moving force behind the injury alleged."  *Bd. of Cnty. Commis of Bryan Cnty., Okl. v. Brown,* 520

24   U.S. 397, 404 (1997) (internal quotation marks omitted).  *Monell* limits municipal liability to

25   instances where the plaintiff's claims are based on one of three theories:  (1) that the alleged

26   constitutional injury was "committed . . . pursuant to a formal governmental policy or a

27   longstanding practice or custom;" (2) "that the individual who committed the constitutional tort

28   was an official with final policymaking authority;" or (3) "that an official with final policymaking

26

1    authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v.*

2    *Delmore,* 979 F.2d 1342, 1346 (9th Cir. 1992) (internal quotation marks omitted).

3        Kyles appears to assert two theories of *Monell* liability against the City: first, that a final

4    policymaker ratified the officers' use of excessive force against Kyles; and second, that there is a

5    "longstanding de facto policy" of deploying police dogs without first issuing a warning to the

6    target suspect.  Opp. 15.  Both theories fail.

7        To prove *Monell* liability based on ratification, the plaintiff must show that the final

8    policymaker in question had "knowledge of the constitutional violation and actually approve[d] of

9    it.  A mere failure to overrule a subordinate's actions, without more, is insufficient to support a

10   section 1983 claim."  *Lytle v. Carl,* 382 F.3d 978, 987 (9th Cir. 2004).  The final policymaker's

11   response to the subordinate's unconstitutional conduct must amount to more than acquiescence; he

12   or she must have affirmatively approved both the subordinate's decision and the basis for it.

13   *Gillette*, 979 F.2d at 1348.

14       Kyles does not point to any evidence showing who the relevant final policymakers were on

15   November 30, 2011, or whether they knew and approved of the allegedly excessive force used

16   against him.  *See* Opp. 15.  The extent of Kyles's ratification evidence appears to be a November

17   30, 2011 memorandum from "Sergeant R. Semas" to "Lieutenant M. Perry" describing the

18   encounter between Kyles and the arresting officers.  *See* Robinson Decl., Ex. 3 (Dkt. No. 38-1).

19   There is no evidence in the record that either Semas or Perry had "final policymaking authority"

20   on November 30, 2011.  Even if one of them did, Kyles has not offered any basis for concluding

21   that either the creation or the receipt of the memorandum, standing alone, amounts to the

22   affirmative approval of his alleged constitutional injury.

23       Kyles's assertion that there is a "longstanding de facto policy" of deploying police dogs

24   without first issuing a warning to the target suspect is also an insufficient basis for imposing

25   *Monell* liability against the City.  Although it is unclear whether Kyles means to assert the

26   existence of a formal municipal policy or, rather, an informal municipal custom, the distinction is

27   irrelevant here because Kyles has not produced sufficient evidence of either.  Apart from his own

28   encounter with Xena, Kyles's only evidence of the alleged "de facto policy" is Simental's

United States District Court
Northern District of California

27

United States District Court
Northern District of California

1  deposition testimony that, during the year that Simental and Palma rode together in Palma's K-9

2  vehicle, Xena was deployed in pursuit of suspects approximately fifty times.[5]  Simental Depo. at

3  66-69 (Robinson Decl., Ex. 6, Dkt. No. 38-6).  Simental states that he does not recall a warning

4  being given in connection with any of those prior deployments.  *Id.*  However, Simental also states

5  that Xena did not make physical contact with any of the suspects she was deployed against.  *Id.*

6  To the best of Simental's knowledge, Kyles was the first suspect that Xena ever bit, and Kyles has

7  not presented evidence indicating otherwise.

8      The November 30, 2011 incident and Simental's deposition testimony, without more, are

9  not sufficient to show unconstitutional policy or custom under *Monell*.  Kyles has not presented

10  direct evidence of a formalized policy, and the facts he has asserted do not give rise to an

11  inference that one exists.  *See Waggy v. Spokane Cnty. Washington*, 594 F.3d 707, 713 (9th Cir.

12  2010) (upholding grant of summary judgment for county on plaintiff's *Monell* claims where

13  plaintiff "point[ed] to no express county policy" and "provid[ed] no evidence showing even an

14  inference that such a [policy] exists").

15      As to the existence of an informal custom, municipal liability on such a theory "must be

16  founded upon practices of sufficient duration, frequency, and consistency that the conduct has

17  become a traditional method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.

18  1996).  Accordingly, "[a] plaintiff cannot prove the existence of a municipal policy or custom

19  based solely on the occurrence of a single incident or unconstitutional action by a non-

20  policymaking employee."  *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir.

21  2001).  "Only if a plaintiff shows that his injury resulted from a permanent and well-settled

22  practice may liability attach for injury resulting from a local government custom."  *Thompson v.

23  City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989).  "[E]vidence of repeated constitutional

24  violations for which the errant municipal officers were not discharged or reprimanded" may

25

26  _____

27  [5] The declaration of Kyles's animal behavior expert, Richard Polsky, is focused exclusively on
   Xena's biting of Kyles and does not include information regarding Xena's prior deployments or

28  the City's policies or customs concerning police dogs.  *See* Polsky Decl. ¶¶ A-E.

1  support a finding of municipal liability.  *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233 (9th

2  Cir. 2011).  But "[w]hen one must resort to inference, conjecture and speculation to explain

3  events, the challenged practice is not of sufficient duration, frequency and consistency to

4  constitute an actionable  policy or custom."  *Trevino*, 99 F.3d at 920.

5        Simental's deposition testimony, which concerns only one police officer's handling of one

6  police dog and reveals nothing about the specific circumstances of any of the police dog's prior

7  deployments, is not enough to satisfy this standard.  This is especially so in light of the testimony

8  that Xena never made physical contact with a suspect during her prior deployments.  No Ninth

9  Circuit case holds that it is a per se constitutional violation to deploy a police dog without

10  warning, even where the police dog does not make physical contact with the suspect.  Rather,

11  Ninth Circuit precedent indicates that as a general matter, "warnings should be given, when

12  feasible, if the use of force may result in serious injury," *Deorle v. Rutherford*, 272 F.3d 1272,

13  1284 (9th Cir. 2001), and that in analyzing the reasonableness of a police dog seizure, the presence

14  or absence of a warning is "just one factor of many," *McKay v. City of Hayward*, 949 F. Supp. 2d

15  971, 983-84 (N.D. Cal. 2013) (reviewing Ninth Circuit police dog cases).  Testimony that Xena

16  had been deployed approximately fifty times, without additional information regarding the specific

17  circumstances of those deployments, is not enough to show the sort of "repeated constitutional

18  violations" necessary to impose *Monell* liability for improper custom.

19  **V.  STATE LAW TORT CLAIMS**

20     **A.  California Tort Claims Act**

21        Kyles's third and fourth causes of action allege negligence, assault, and battery against all

22  defendants.  Compl. ¶¶ 42-55.  Defendants argue that these causes of action are barred because

23  Kyles failed to file a timely administrative claim with the City of Pittsburg as required under the

24  California Tort Claims Act ("CTCA").  Mot. 24-25.  The argument is without merit because

25  defendants, by failing to comply with the CTCA themselves, have waived their right to a

26  timeliness defense.

27        The CTCA provides that a plaintiff may not maintain a personal injury action against a

28  public entity unless he first presents his claim to the entity within six months of the date of accrual

United States District Court
Northern District of California

of the cause of action.  Cal. Gov. Code §§ 911.2, 945.4; *see also, Mangold v. California Pub. Utilities Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995) ("The [CTCA] requires, as a condition precedent to suit against a public entity, the timely presentation of a written claim and the rejection of the claim in whole or in part.").  Under the CTCA, the date of accrual is "the date upon which the cause of action would be deemed to have accrued within the meaning of the statute of limitations which would be applicable thereto if there were no requirement that a claim be presented to and be acted upon by the public entity before an action could be commenced thereon."  Cal. Gov. Code § 901.  In California, tort claims generally accrue on the date the tortious conduct occurs.  *See Butler v. Los Angeles Cnty.*, 617 F. Supp. 2d 994, 1002 (C.D. Cal. 2008); *Gallardo v. DiCarlo*, 203 F. Supp. 2d 1160, 1169 (C.D. Cal. 2002).

Kyles's cause of action against defendants accrued on November 30, 2011, meaning that Kyles had until May 30, 2011 to file an administrative claim with the City.  A claim is considered filed on the date the claimant deposits it in the mail.  Cal. Gov. Code § 915.2.  Kyles asserts in his opposition brief that he complied with the CTCA by depositing his claim in the mail on May 30, 2011.  Opp. 15-16.  In support, Kyles points to his claim, which is dated May 30, 2011, and the attached proof of service, which is also dated May 30, 2011.  Allen Decl., Ex. F.  Kyles also alleges in his complaint that he "was required [under the CTCA] to file claims and did file said claims within six months of November 30, 2011."  Compl. ¶ 43.

Defendants assert that Kyles's administrative claim was in fact mailed on May 31, 2011, one day after the six-month deadline.  Mot. 24-25.  In support, defendants point to the envelope in which Kyles's claim was mailed, which is postmarked May 31, 2011.  Allen Decl., Ex. F.  Defendants contend that "this tardiness bars [Kyles's] state law claims."  Mot. 24-25.

Defendants also point to a "Notice of Untimely Claim" dated June 12, 2012 and addressed from the City of Pittsburg to Kyles's attorney.  Allen Decl., Ex. G.  The notice states:

> The claim you presented against the City of Pittsburg on June 1, 2012 is being returned because it was not presented within . . . six months after the event or occurrence as required by law.  Because the claim was not presented within the time allowed by law, no action was taken on the claim.  The City has no authority to take action on any claim presented more than one year after the event or occurrence.

United States District Court
Northern District of California

> The late claim procedure cannot be invoked on behalf of claims that are late under the one-year rule.  The court is without jurisdiction to grant leave to file a late claim against the government if application is filed more than one-year after accrual of a cause of action.
>
> You may seek advice of an attorney of your choice, at your own cost, in connection with this matter.  If you desire to consult an attorney, you should do so immediately.

*Id.* (internal citations omitted).  Defendants assert, and Kyles does not dispute, that Kyles did not respond to the notice.  Mot. 25.

The notice cites to four sections of the California Government Code, sections 901, 911.2, 911.3, and 911.4.  Allen Decl., Ex. G.  Section 901 defines the date on which a cause of action begins to accrue, i.e., the date the statute of limitations begins to run.  Cal. Gov. Code § 901.  Section 911.2 provides the basic rule that "[a] claim related to a cause of action . . . for injury to person . . . shall be presented . . . not later than six months after the accrual of the cause of action."  Cal. Gov. Code § 911.2.  Section 911.4 allows a claimant who has missed the six-month filing deadline to make a written application to the public entity for leave to present the untimely claim.  The application must be made within one year of the accrual date of the cause of action.  Cal. Gov. Code § 911.4(b).   There is no indication that Kyles filed an application pursuant to section 911.4.

Under section 911.3(a), where a public entity receives an untimely claim, the entity has 45 days to provide written notice to the claimant that his claim was not timely filed and that it is "being returned without further action."  Cal. Gov. Code § 911.3(a).  The statute directs that the written notice "shall be in substantially the following form":

> The claim you presented to the (insert title of board or officer) on (indicate date) is being returned because it was not presented within six months after the event or occurrence as required by law.  Because the claim was not presented within the time allowed by law, no action was taken on the claim.
>
> Your only recourse at this time is to apply without delay to (name of public entity) for leave to present a late claim.  Under some circumstances, leave to present a late claim will be granted.
>
> You may seek the advice of an attorney of your choice in connection with this matter.  If you desire to consult an attorney, you should do so immediately.

*Id.* (internal citations omitted).

Section 911.3(b) provides that if the public entity fails to provide written notice to the claimant as required by section 911.3(a), "any defense as to the time limit for presenting a claim . . . is waived." Cal. Gov. Code § 911.3(a); *see also, Phillips v. Desert Hosp. Dist.*, 49 Cal.3d 699, 711 (1989) ("[A]s it failed to notify plaintiffs of any timeliness defects (§ 911.3, subd. (a)), the hospital has . . . waived any defenses it might have raised on the ground of plaintiffs' asserted failure to present a timely claim (§ 911.3, subd. (b))."").

The reason that defendants have waived a timeliness defense here is that the notice sent to Kyles does not comply with section 911.3(a). The notice completely omits the second paragraph of the exemplary language provided in the statute. Instead of stating that "[y]our only recourse at this time is to apply without delay . . . for leave to present a late claim" and that "[u]nder some circumstances, leave to present a late claim will be granted," the notice states that the City "has no authority to take action on any claim presented more than one year after the event or occurrence" and that "[t]he late claim procedure cannot be invoked on behalf of claims that are late under the one-year rule." Allen Decl., Ex. G. Rather than informing the recipient of the statutorily-provided avenue for late-claim relief, the language in the City's section 911.3(a) notice creates the impression that late-claim relief is not possibly available.

Strictly speaking, the City's section 911.3(a) notice is correct. Section 911.4 requires that an application for leave to present an untimely claim be filed within one year of the accrual date of the cause of action. Thus, a public entity cannot "take action on any claim presented" after the one-year deadline has passed because "[t]he late claim procedure" has closed. Allen Decl., Ex. G. But this information, while technically accurate, is delivered in the notice in such a way as to create the false impression that the recipient has already missed his opportunity to seek leave to present a late claim. The notice thus fails to "substantially follow" the form prescribed by section 911.3(a). Under section 911.3(b), the consequence of this failure is waiver of "any defense as to the time limit for presenting a claim." Cal. Gov. Code § 911.3(a); *see also, Phillips*, 49 Cal.3d at 711.

At the hearing on October 22, 2014, I granted defendants' request for leave to submit

1    supplemental briefing on this issue, and defendants filed a supplemental brief on October 24,

2    2014.  Dkt. No. 57.  The additional arguments contained therein are not convincing.  First,

3    defendants emphasize that California courts apply a "substantial compliance" doctrine when

4    construing the CTCA.  *Id.* at 2-3.  While this is true, defendants do not present a single California

5    case applying the "substantial compliance" doctrine to a section 911.3(a) notice.  *See id.*  If

6    anything, defendants' emphasis on "substantial compliance" cuts against their position, because,

7    as defendants point out, California courts generally apply the doctrine in the name of effectuating

8    the CTCA's purpose, which is "to provide the public entity sufficient information to enable it to

9    adequately investigate claims and to settle them, if appropriate, without the expense of litigation."

10   *Stockett v. Ass'n of California Water Agencies Joint Powers Ins. Auth.*, 34 Cal.4th 441, 446

11   (2004).  The California Supreme Court has cautioned that because the administrative claim

12   requirement is designed "to give the government entity notice sufficient for it to investigate and

13   evaluate the claim, not to eliminate meritorious actions, the [CTCA] should not be applied to snare

14   the unwary where its purpose has been satisfied."  *Id.*; *see also, Sykora v. State Dep't of State*

15   *Hospitals*, 225 Cal. App. 4th 1530, 1536 (2014) ("The Legislature recognized that claimants make

16   mistakes during the claims process and must be given an opportunity to correct them.

17   Consequently, it . . . granted courts authority to apply the substantial compliance doctrine.").  The

18   substantial compliance doctrine provides more support for the notion that a California court would

19   excuse Kyles's failure to submit a timely claim than that one would find the City's notice adequate

20   under section 911.3(a).

21          Second, defendants point to a recent case from this district which found that a section

22   911.3(a) notice was adequate despite using language significantly different from that provided in

23   the statute.  *See Navarro v. City of Alameda*, No. 14-cv-01954-JD, 2014 WL 4744184, at *3 (N.D.

24   Cal. Sept. 22, 2014).  The notice in that case stated:

25          The claim you presented to the City of Alameda on February 19, 2014 is being
          returned because it was not presented within six months after the event or
26          occurrence as required by law.  The alleged incident . . . occurred on July 27,
          2012.  Because this claim was not presented within the time allowed by law, no
27          action is being taken on the claim.

28

United States District Court
Northern District of California

1

2

> Although a claimant may apply to the City for leave to present a late claim, such application for late claim relief must be presented no later than one year after the accrual of the cause of action.  Therefore, such application for late claim relief in this case would be untimely as well.

3

4

*Navarro*, No. 14-cv-01954-JD (N.D. Cal. Apr. 29, 2014), Dkt. No. 12 (internal citations omitted).[6]

5   The court held that this notice adequately complied with section 911.3(a) because it "gave plaintiff

6   proper notice of the defects in [his] claim" and "advised him that the claim was late and that any

7   application to present a late claim would be futile."  *Navarro*, 2014 WL 4744184, at *3.

8   Defendants contend that the City's section 911.3(a) notice is similar to the one held adequate in

9   *Navarro*.

10          The crucial difference between *Navarro* and the instant case is evident on the face of the

11   notice sent to the plaintiff in *Navarro*.  There, the plaintiff submitted his untimely claim more than

12   a year after the alleged incident on which the claim was based.  There was thus no reason for the

13   City to inform the plaintiff that his "only recourse at this time is to apply without delay . . . for

14   leave to present a late claim" and that "[u]nder some circumstances, leave to present a late claim

15   will be granted."  Cal. Gov. Code § 911.3(a).  Under section 911.4, the plaintiff was already barred

16   from seeking late claim relief.  Here, on the other hand, Kyles submitted his untimely claim well

17   within one year of its date of accrual, meaning that under section 911.4, Kyles was still entitled to

18   an opportunity to file an application for leave to present his untimely claim.  In light of this

19   difference, *Navarro* does not support defendants' contention that the City's section 911.3(a) notice

20   is adequate under the statute.

21          Finally, defendants cite to *Rason v. Santa Barbara City Housing Authority*, 201 Cal. App.

22   3d. 817 (1988), which noted that the "[y]our only recourse" language in a section 911.3(a) notice

23   can be misleading because, where a claimant wishes to dispute a public entity's determination of

24   untimeliness, the claimant must do so by filing a civil lawsuit, not by seeking late claim relief

25   under section 911.4.  *Id.* at 827-28.  This case does not support the position that a section 911.3(a)

26   notice need not contain the "[y]our only recourse" language or its substantial equivalent.  The case

27

28   _____

[6] Defendants' request for judicial notice of this document is GRANTED.

United States District Court
Northern District of California

1    merely observes one misleading aspect of the language; it does not mandate or excuse the

2    language's complete omission.  Indeed, the case even notes that the "[y]our only recourse"

3    warning "is required by statute."  *Id.* at 828.

4         Because the "Notice of Untimely Claim" failed to comply with section 911.3(a), the

5    dispute over the date on which Kyles submitted his administrative claim is moot.  Any objection to

6    Kyle's administrative claim for lack of timeliness has been waived, and the CTCA is not a bar to

7    his state law causes of action.

8         **2.  *Heck* Analysis**

9         Defendants next assert that Kyles's state law tort claims are barred by the California

10   equivalent to the *Heck* doctrine.  Although *Heck* "is a rule of federal law that applies only to

11   federal causes of action," the California Supreme Court has held that *Heck* analysis "applies

12   equally" to tort claims arising from state law.  *Yount v. City of Sacram*ento, 43 Cal.4th 885, 902

13   (2008); *see also, Villegas v. City of Colton*, No. 09-cv-00644, 2010 WL 5252721, at *5 (C.D. Cal.

14   Dec. 9, 2010) ("Like [plaintiff's] section 1983 claims for excessive force, his assault and battery

15   claims are barred by the *Heck* doctrine."); *Baldacchino v. Cnty. of El Dorado*, No. 01-cv-01910,

16   2009 WL 3246451, at *5 (E.D. Cal. Oct. 6, 2009) ("Plaintiff also asserts state law claims for

17   assault and battery.  The principles established by *Heck* apply to both those claims").

18        Like Kyles's excessive force cause of action, his negligence and assault and battery causes

19   of action do not necessarily arise from the same "factual context" as his conviction under

20   California Penal Code section 148(a)(1).  *See Hooper*, 629 F.3d at 1134.  For this reason, they do

21   not threaten the validity of that conviction and are not barred under the California analog to *Heck*

22   analysis.

23        **3.  Merits**

24        Defendants argue that the state law tort claims fail on their merits because the force used

25   by the officers against Kyles was reasonable as a matter of law.  Mot. 25; Reply 11.  This

26   argument fails for the same reason it fails as applied to Kyles's excessive force claims.  *Young v.*

27   *Cnty. of Los Angeles*, 655 F.3d 1156, 1170 (9th Cir. 2011) (holding that "the Fourth Amendment

28   violation alleged by [plaintiff] also suffices to establish the breach of a duty of care under

United States District Court
Northern District of California

1  California law"); *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009) ("A state law battery

2  claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove

3  that the peace officer's use of force was unreasonable.").  Material factual disputes remain as to

4  whether the officers' use of force against Kyles was reasonable.  Whether that use of force

5  amounted to negligence, assault, or battery is a question for the jury.

6  **VI.  PUNITIVE DAMAGES**

7      Kyles seeks punitive damages.  "[A] jury may be permitted to assess punitive damages in

8  an action under section 1983 when the defendant's conduct is shown to be motivated by evil

9  motive or intent, or when it involves reckless or callous indifference to the federally protected

10  rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  California law conditions punitive

11  damages on the plaintiff proving "by clear and convincing evidence that the defendant has been

12  guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294(a).  "Malice" in this context

13  includes the "willful and conscious disregard of the rights or safety of others."  *Id.* § 3294(c)(1).

14  The evidence in this case is sufficient to raise a triable issue as to the state of mind of each officer

15  during the November 30, 2011 incident.  Defendants are not entitled to summary judgment on the

16  issue of punitive damages.

17                                **CONCLUSION**

18      For the reasons discussed above, the motion is GRANTED IN PART and DENIED IN

19  PART.  The motion is GRANTED as to the unlawful arrest and unreasonable seizure causes of

20  action, and as to all claims for *Monell* liability against the City.  It is DENIED as to the excessive

21  force cause of action and the state law tort claims.

22      **IT IS SO ORDERED**.

23  Dated: October 31, 2014



24  _____
25  WILLIAM H. ORRICK
    United States District Judge
26
27
28

*(left margin: United States District Court / Northern District of California)*